No. 24-2544

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT
———————————————

NINA JANKOWICZ
Plaintiff-Appellant

v.

FOX NEWS NETWORK, LLC, and
FOX CORPORATION
Defendants-Appellees
———————————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
———————————————————

BRIEF FOR APPELLANT NINA JANKOWICZ
AND APPENDIX VOLUME 1 OF 2

Max Rodriguez
LAW OFFICE OF MAX RODRIGUEZ PLLC
575 5th Avenue, 14th Floor
New York, NY 10017
(646) 741-5167

Rylee Sommers-Flanagan
Molly E. Danahy
UPPER SEVEN LAW
1 N. Last Chance Gulch, Suite 5
Helena, MT 59601
(406) 306-0330

*Attorneys for Plaintiff-Appellant*
*Nina Jankowicz*

# **TABLE OF CONTENTS**

STATEMENT REGARDING JURISDICTION.....................................................1

STATEMENT OF THE ISSUES PRESENTED ......................................................1

STATEMENT OF RELATED PROCEEDINGS ...................................................1

STANDARD OF REVIEW.................................................................................2

STATEMENT OF THE CASE ............................................................................2

    I.     Statement of Facts...................................................................................4

         A.     After announcing the Board's creation, officials rapidly clarified its purpose. .................................................................4

         B.     After resigning, Jankowicz publicly confirmed the Board had no operational authority...........................................................6

         C.     The Board's charter was published, confirming that it had no operational authority.................................................................7

         D.     Jankowicz's writing and public remarks denounce censorship. ...................................................................................10

         E.     Fox engages in a campaign of false coverage about Jankowicz without acknowledging or incorporating new information. ......10

         F.     Fox's statements about Jankowicz and the Board were false...11

              1.     Fox specifically and falsely stated that Jankowicz could censor Americans. ........................................................11

              2.     Fox specifically and falsely stated that Jankowicz could surveil Americans.........................................................12

              3.     Fox specifically and falsely stated that Jankowicz was a physical threat to Americans' safety and liberty.............13

              4.     When Fox called Jankowicz a censor and the "Minister of Truth," it was invoking its other statements about her. ...................................................................................13

          G.     Statements about the Board directly referred to Jankowicz. ....15

         H.     Even after reporting her resignation, Fox made false statements claiming Jankowicz was fired. ................................................17

          I.     Fox falsely claimed that Jankowicz was involved in advocating for a Twitter tool that could edit other users' tweets. ..............17

J.      Fox's audience understood Fox's coverage to be factual and, as a result, believed Jankowicz was a threat worthy of relentless harassment. ...............................................................18

II.     Procedural History ............................................................21

III.    The decision presented for review ....................................22

SUMMARY OF ARGUMENT...................................................24

ARGUMENT .........................................................................26

I.      The usual *Iqbal* standard governs Fox's motion.................26

A.      The District Court failed to adhere to the well-established standard for evaluating factual allegations on a motion to dismiss. ...................................................................26

B.      No heightened pleading standard applies to Jankowicz's defamation claim. ..........................................................28

II.     Jankowicz states a claim for defamation. ..........................29

A.      Fox's statements about Jankowicz are actionable false statements of fact. ..........................................................30

1.      Fox's statements about Jankowicz and the Board have precise and factually false meaning. ...........................31

i........ Fox made specific claims about how Jankowicz would "censor" Americans............................................32

ii. ...... Fox made specific claims about how Jankowicz would "surveil" Americans. ...........................................32

iii. ..... Fox made specific claims about how Jankowicz would physically harm or imprison Americans. ............33

iv........The District Court's erroneous analysis ignored most allegations in the Complaint, instead focusing on a context-stripped analysis of the word "censor." ............34

2.      Fox's statements about Jankowicz and the Board are objectively verifiable as false. .......................................38

3.      The broader social context confirms Fox's statements about Jankowicz and the Board are actionable. .............39

4.      Fox's statements claiming Jankowicz was fired are actionable. ...................................................................40

5. Fox's statements claiming Jankowicz was involved in or associated with the Birdwatch feature on Twitter are actionable. ...................................................................41

B. Jankowicz plausibly alleges Fox's statements were of and concerning her. ........................................................43

C. Fox's statements were false. ....................................................44

1. Fox's statements about Jankowicz and the Board were false. ............................................................44

i. ............The District Court selectively misread the Board's charter. ..............................................45

ii. .......The Supreme Court repudiated the theory of "censorship" at the heart of Fox's narrative, enhancing the plausibility of Jankowicz's allegations.....................48

2. Fox's statements claiming Jankowicz was fired were false. .................................................................50

3. Fox's statements claiming Jankowicz was associated with Birdwatch were false.......................................51

D. Jankowicz plausibly alleges Fox's statements were made with actual malice............................................................52

1. Fox knowingly ignored key facts. ...................................52

2. Fox has ignored factual debunking before, putting profit over accuracy.................................................53

3. Fox wanted to inflame its audience's hatred of Jankowicz and succeeded................................................54

E. Jankowicz plausibly alleges Fox's statements were defamation *per se.* ....................................................................55

F. Jankowicz plausibly alleges a claim against Fox Corporation. 55

CONCLUSION ...........................................................................57

CERTIFICATE OF COMPLIANCE .................................................58

APPENDIX VOLUME 1 OF 2 (Pages 1–21)

# TABLE OF AUTHORITIES

## CASES

*600 W. 115th St. Corp. v. Von Gutfeld*, 603 N.E.2d 930 (N.Y. 1992) ...................30

*Abbas v. Foreign Policy Grp., LLC*,
    783 F.3d 1328 (D.C. Cir. 2015)....................................................................29

*Afftrex, Ltd. v. Gen. Elec. Co.*,
    555 N.Y.S.2d 903 (N.Y. App. Div. 1990) ....................................................51

*Animal Sci. Prods., Inc. v. China Minmetals Corp.*,
    654 F.3d 462 (3d Cir. 2011) .........................................................................26

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .........................................................................2, 27, 28

*Baker v. Galusha*,
    981 N.Y.S.2d 198 (N.Y. App. Div. 2014) ....................................................36

*Block v. Tanenhaus*,
    867 F.3d 585 (5th Cir. 2017) ........................................................................43

*Brian v. Richardson*,
    660 N.E.2d 1126 (N.Y. 1995) ......................................................................39

*Carbone v. Cable News Network, Inc.*,
    910 F.3d 1345 (11th Cir. 2018) ....................................................................28

*Celle v. Filipino Reporter Enters. Inc.*,
    209 F.3d 163 (2d Cir. 2000) ....................................................37, 53, 54, 55

*Cianci v. New Times Pub. Co.*,
    639 F.2d 54 (2d Cir. 1980) ...........................................................................31

*Connelly v. Lane Const. Corp.*,
    809 F.3d 780 (3d Cir. 2016) ...................................................................27, 28

*Dalbec v. Gentleman's Companion, Inc.*,
   828 F.2d 921 (2d Cir. 1987) ...........................................................53

*Davis v. Ross*,
   754 F.2d 80 (2d Cir. 1985) ...............................................43, 51, 55

*DiFolco v. MSNBC Cable LLC*,
   622 F.3d 104 (2d Cir. 2010) ..........................................................50

*Doe v. Princeton Univ.*,
   30 F.4th 335 (3d Cir. 2022) .......................................................2, 27

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*,
   194 F. Supp. 3d 263 (S.D.N.Y. 2016) .............................................36

*Erie Ins. Exch. v. Md. Ins. Admin.*,
   105 F.4th 145 (4th Cir. 2024) ........................................................27

*Flora v. Cnty. of Luzerne*,
   776 F.3d 169 (3d Cir. 2015) ..........................................................26

*Forrest v. Owen J. Roberts Sch. Dist.*,
   No. 09-cv-3014, 2011 WL 1549492 (E.D. Pa. Apr. 1, 2011) .........................29

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3d Cir. 2009) ......................................................2, 27

*Franklin v. Daily Holdings, Inc.*,
   21 N.Y.S.3d 6 (N.Y. App. Div. 2015) .......................................42, 47

*Gjonlekaj v. Sot*,
   764 N.Y.S.2d 278 (N.Y. App. Div. 2003) .......................................40

*Greenberg v. Spitzer*,
   62 N.Y.S.3d 372 (N.Y. App. Div. 2017) .........................................34

*Gross v. N.Y. Times Co.*,
   82 N.Y.2d 146 (1993) ...................................................................30

*Harte-Hanks Commc'ns., Inc. v. Connaughton*,
    491 U.S. 657 (1989) ........................................................................52

*Hatfill v. N.Y. Times Co.*,
    416 F.3d 320 (4th Cir. 2005) ........................................................37

*Immuno AG v. Moor-Jankowski*,
    567 N.E.2d 1270 (N.Y. 1991) ...............................................35, 39

*Immuno AG v. Moor-Jankowski,*549 N.E.2d 129 (N.Y. 1989) .............................35

*Jacob v. Lorenz*,
    626 F. Supp. 3d 672 (S.D.N.Y. 2022) ..........................................30

*Johnston v. Borders*,
    36 F.4th 1254 (5th Cir. 2022) .......................................................37

*Karedes v. Ackerly Grp., Inc.*,
    423 F.3d 107 (2d Cir. 2005) .....................................................37, 44

*Khalil v. Fox Corp.*,
    630 F. Supp. 3d 568 (S.D.N.Y. 2022) ......................................53, 56

*Klocke v. Watson*,
    936 F.3d 240 (5th Cir. 2019) ........................................................28

*Krusen v. Moss*,
    105 N.Y.S.3d 607 (N.Y. App. Div. 2019) ....................................34

*La Liberte v. Reid*,
    966 F.3d 79 (2d Cir. 2020) ............................................................28

*Loder v. Nied*,
    932 N.Y.S.2d 546 (N.Y. App. Div. 2011) ...................................34

*Los Lobos Renewable Power, LLC v. Americulture, Inc.*,
    885 F.3d 659 (10th Cir. 2018) ......................................................28

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991) ......................................................................42

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990) ..................................................................31

*Missouri v. Biden*,
    83 F.4th 350 (5th Cir. 2023) ..............................................48

*Missouri v. Biden*,
    680 F. Supp. 3d 630 (W.D. La. 2023) ................................48

*Murthy v. Missouri*,
    603 U.S. 43 (2024) .........................................................48, 49

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024) ...........................................24, 26, 27, 27

*NOVAGOLD Res., Inc. v. J Cap. Rsch. USA LLC*,
    No. 20-cv-2875, 2022 WL 900604 (E.D.N.Y. Mar. 28, 2022) ......................35

*Palin v. N.Y. Times Co.*,
    940 F.3d 804 (2d Cir. 2019) ........................29, 44, 51, 52

*Pinker v. Roche Holdings Ltd.*,
    292 F.3d 361 (3d Cir. 2002) .................................................2

*Pisani v. Staten Island Univ. Hosp.*,
    440 F. Supp. 2d 168 (E.D.N.Y. 2006) ................................55

*Price v. Stossel*,
    620 F.3d 992 (9th Cir. 2010) ..............................................42

*Project Veritas v. Cable News Network, Inc.*,
    121 F.4th 1267 (11th Cir. 2024) ....................................47, 50

*Prozeralik v. Capital Cities Commc'ns, Inc.*,
    626 N.E.2d 34 (N.Y. 1993) .................................................38

*Rapid Cirs., Inc. v. Sun Nat. Bank*,
    No. 10-cv-6401, 2011 WL 1666919 (E.D. Pa. May 3, 2011) ......................29

*Restis v. Am. Coal. Against Nuclear Iran, Inc.*,
    53 F. Supp. 3d 705 (S.D.N.Y. 2014) ........................................36, 37

*Rinaldi v. Holt, Rinehart & Winston, Inc.*,
    42 N.Y.2d 369 (N.Y. 1977) ..........................................................31

*Sandals Resorts Int'l Ltd. v. Google, Inc.*,
    925 N.Y.S.2d 407 (N.Y. App. Div. 2011) ..................................38, 39

*Schatzberg v. State Farm Mut. Auto. Ins. Co.*,
    877 F. Supp. 2d 232 (E.D. Pa. 2012) ...........................................29

*Schuchardt v. President of the United States*,
    839 F.3d 336 (3d Cir. 2016) .........................................................26

*State v. Biden*,
    80 F.4th 641 (5th Cir. 2023) .........................................................48

*Sunshine Sportswear & Elecs., Inc. v. WSOC Television, Inc.*,
    738 F. Supp. 1499 (D.S.C. 1989) .................................................36

*Sweeney v. Prisoners' Legal Servs. of N.Y.*,
    84 N.Y.2d 786 (N.Y. 1995) ..........................................................52

*Tah v. Global Witness Publishing, Inc.*,
    413 F. Supp. 3d 1 (D.D.C. 2019) .................................................39

*Tavoulareas v. Piro*,
    817 F.2d 762 (D.C. Cir. 1987) .....................................................54

*Treppel v. Biovail Corp.*,
    No. 03-cv-3002, 2005 WL 2086339 (S.D.N.Y. Aug. 30, 2005) ....................56

*US Dominion, Inc. v. Fox Corp.*, No. N21C–11–082 EMD CCLD,
    2022 WL 2229781 (Del. Sup. Ct. June 21, 2022) ..........................56

*US Dominion, Inc. v. Fox News Network, LLC*,
    293 A.3d 1002 (Del. Sup. Ct. 2023) .............................................38

*US Dominion, Inc. v. Fox News Network, LLC*,
    2021 WL 5984265 (Del. Sup. Ct. Dec. 16, 2021) ...........................................40

*Wisniewski v. Fisher*,
    857 F.3d 152 (3d Cir. 2017) ...........................................................................2

*Yesner v. Spinner*,
    765 F. Supp. 48 (E.D.N.Y. 1991) ..................................................................55

*Zerman v. Sullivan & Cromwell*,
    677 F. Supp. 1316 (S.D.N.Y. 1988) .............................................................44

## **STATUTES**

28 U.S.C. § 1291 ...............................................................................................1

28 U.S.C. § 1332 ...............................................................................................1

N.Y. Civil Practice Law & Rules § 3211 ...........................................................28

## **FEDERAL RULES**

Fed. R. App. P. 10 ...........................................................................................21

Fed. R. Civ. P. 12 .............................................................................27, 27, 28, 50

## STATEMENT REGARDING JURISDICTION

The District Court had jurisdiction of this case under 28 U.S.C. § 1332, which provides for jurisdiction over actions between citizens of different states where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a)(1). This Court has appellate jurisdiction over this appeal from the grant of a motion to dismiss filed by Defendants-Appellees Fox News Network, LLC, and Fox Corporation (collectively "Fox") under 28 U.S.C. § 1291. The District Court granted the motion to dismiss on July 22, 2024, and Plaintiff-Appellant Nina Jankowicz timely filed her notice of appeal on August 20, 2024.

## STATEMENT OF THE ISSUES PRESENTED

Whether (1) the District Court erred when it applied the wrong legal standard to grant Fox's motion to dismiss Jankowicz's First Amended Complaint, App'x 31–124 (hereinafter "Complaint"); *see* App'x 5–6; and (2) the District Court erred in concluding that Jankowicz had failed to state a claim against Fox for defamation. *See* App'x 7–19.[1]

## STATEMENT OF RELATED PROCEEDINGS

This case has not been before this Court. Jankowicz is not aware of any related proceedings pending or about to be presented to this or any other court.

---

[1] Citations to the Complaint will refer to the Appendix page number and then to the Complaint paragraph number.

## STANDARD OF REVIEW

This Court "review[s] the grant of a motion to dismiss de novo." *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022). The Court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002).

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Whether defendants have an alternative view of the allegations is, at this stage, irrelevant. Instead, the question is only "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)); *see also Wisniewski v. Fisher*, 857 F.3d 152, 155–56 (3d Cir. 2017).

## STATEMENT OF THE CASE

Nina Jankowicz was not a candidate for office or a senior official. She had been hired as the Executive Director of a new internal working group in the Department of Homeland Security ("DHS") to study how other components of DHS responded to disinformation, misinformation, and malinformation (collectively "MDM"), and propose internal governance policies, compliance, and best practices

for those components to consider.[2] This was DHS's newly-created Disinformation Governance Board (the "Board"). She was a mid-level public servant with no external operational authority.

Fox ran with a different narrative. Fox claimed repeatedly—talking about Jankowicz more than 300 times over eight months in 2022, App'x 31, ¶ 1—that Jankowicz was the figurehead of a supposed government-wide conspiracy to censor and surveil Americans' free speech. Government officials and media outlets debunked that the Board or Jankowicz could censor or surveil anyone. Fox remained undeterred even when the Board's charter was published, which confirmed what all these previous sources said.

Having been offered the opportunity to stay in DHS after the Board was paused, Jankowicz resigned instead. After initially acknowledging she had resigned, Fox falsely and repeatedly claimed Jankowicz was fired from DHS.

Fox also selectively edited clips of Jankowicz's recorded public remarks from a Zoom event. Fox claimed that Jankowicz was involved in and advocating for a newly-developed tool at Twitter. Jankowicz was not involved in this tool, was not advocating for it, and her remarks included skepticism about it.

---

[2] The components of MDM are defined by DHS. *See* Cybersecurity and Infrastructure Security Agency, *Foreign Influence Operations and Disinformation*, *available* at https://www.cisa.gov/topics/election-security/foreign-influence-operations-and-disinformation (last visited Dec. 29, 2024).

These false narratives came with disastrous consequences for Jankowicz. Fox's audience was outraged by the false narrative Fox had created. They responded by harassing her, calling for her death, inviting her to commit suicide, revealing personally identifying information like her home address, and threatening her family. Jankowicz asserts a claim for defamation *per se* against Fox.

## I. <u>Statement of Facts</u>

### A. After announcing the Board's creation, officials rapidly clarified its purpose.

In late April 2022, DHS Secretary Alejandro Mayorkas announced the Board, identifying Jankowicz as its Executive Director. App'x 45, ¶ 34. Fox led the subsequent frenzy. App'x 46–64, ¶¶ 36–72. In the week following the announcement, Fox covered Jankowicz and/or the Board in 70 percent of its one-hour programs. App'x 46, ¶ 36.

The federal government quickly worked to clarify what the Board was, what it could do, and what it could not do. On May 1, 2022, in an interview on Fox News Sunday, Secretary Mayorkas explained that the Board was a "working group that takes best practices to make sure that in addressing disinformation that presents a threat to the homeland that [DHS's] work does not infringe on free speech, does not infringe on civil rights, civil liberties." App'x 55, ¶ 54.

The next day, DHS published a "Fact Sheet" about the Board. App'x 56, ¶ 56. The fact sheet said the Board "does not have any operational authority or capability."

App'x 57, ¶ 58. Instead, it was "an internal working group" established "with the explicit goal of ensuring [free speech and civil liberties] protections are incorporated across DHS's disinformation-related work and that rigorous safeguards are in place. The working group also seeks to coordinate the Department's engagements on this subject with other federal agencies and a diverse range of external stakeholders." App'x 56–57, ¶ 57.

The same day, in response to questions from Fox's own correspondent, the White House Press Secretary reiterated that the Board would "help coordinate internal activities from [DHS] related to disinformation," and its "mandate is not to adjudicate what is true or false online." App'x 57, ¶ 59. She said the Board's only conceivable public-facing function might be "putting out public products that represent[] the department's view on disinformation related matters." App'x 57–58, ¶ 59.

Meanwhile, the New York Times published a piece discussing partisan blowback to the Board instigated by Fox. The piece quoted a former DHS official who said the Board's function was "making sure that when the department's components are doing that analysis, they're operating in a manner consistent with their authorities." He specifically refuted claims that the Board could police speech or censor anyone. He said, "[i]t's not a big room with feeds from Facebook and Twitter popping up . . . . It looks at policy issues, it looks at best practices, it looks

at academic research relating to how disinformation influences the threat environment." App'x 58, ¶ 60.

On May 4, 2022, Secretary Mayorkas testified before a Senate subcommittee, reiterating that the Board could not "exercise operational authority" and had no "operational capability." App'x 59, ¶ 61. He said the Board would develop "standards and policies" so that "disinformation work that has been ongoing in [DHS] for nearly 10 years does not infringe on people's free speech rights, privacy rights, civil rights, and civil liberties." He emphasized that the Board is "not the truth police." App'x 59, ¶ 61.

### B. After resigning, Jankowicz publicly confirmed the Board had no operational authority.

On May 18, 2022, after weeks of harassment, threats, and abuse that Fox instigated, DHS announced the Board was "paused," App'x 65, ¶ 76, and Jankowicz resigned. App'x 65, ¶ 77. No longer a federal employee, she could now speak on her own behalf. In an interview on MSNBC, she explained that prior reporting about the Board was "completely wrong" because the Board was a "coordinating mechanism" that would ensure different components of DHS "were talking to each other" about how those components—not the Board and not Jankowicz—were responding to disinformation. App'x 68, ¶ 84. She said, "this initiative [the Board] was not involved in policing speech and neither was I." She also explained that DHS efforts

"for over a decade now" were "about putting good information out there," not censorship. App'x 68, ¶ 84.

On May 26, 2022, Jankowicz was interviewed on NPR and described the Board in the same terms—as "an internal working group" meant "to support and advise the operational components of DHS. We had no operational authority or capability. It was still DHS' components that were doing the work, making decisions, et cetera." The Board "was a coordinating mechanism. It was meant to … make sure that the very large agency, that is the Department of Homeland Security, that people were talking to each other within it." App'x 68–69, ¶ 85.

### C. The Board's charter was published, confirming that it had no operational authority.

On June 7, 2022, two Senators made the Board's charter and several other documents public. App'x 70, ¶ 87. The charter said "Department Components" like the Federal Emergency Management Agency ("FEMA"), would "lead on operational responses to MDM … in their relevant mission spaces" and the Board would "serve as the central forum in the Department to ensure consistent governance and coordination of such efforts, and adherence to applicable constitutional, statutory, and regulatory authorities and obligations." App'x 70, ¶ 88. The charter contrasted the Board's responsibilities with operational Department Components' responsibilities, explaining "Components will lead on MDM-related operational responses and other efforts to counter MDM in their relevant mission spaces," App'x

135, and the Board would "develop and support the implementation of governance policies and protocols" that those components could consider. App'x 134.

The charter's second paragraph described the "four cross-functional lines of effort" the Board would "develop and support the implementation of governance policies and protocols" for: (1) identifying MDM; (2) assessing and analyzing the risk MDM poses to homeland security; (3) responding to these MDM threats; and (4) building resilience to them. App'x 134. These policies and protocols would "protect privacy, civil rights, and civil liberties; harmonize and support coordination with other departments and agencies, the private sector, and non-governmental organizations; and support research and development efforts to assess and combat MDM." App'x 134.

The charter delineated the same separation between the Board and operational components like FEMA that been discussed and repeated in Secretary Mayorkas' interviews and testimony, the DHS fact sheet, the White House Press Secretary's remarks, the former DHS official's remarks to the New York Times, and Jankowicz's statements after her resignation.

The charter also laid out Jankowicz's discrete responsibilities as Executive Director. These responsibilities were to: (1) "propose agenda items and discussion topics for the Board following Steering Group review;" (2) communicate Steering Group positions concerning proposals before the Board; (3) "propose summaries of

conclusion for each Board and Steering Group meeting;" (4) "implement and execute Board decisions through the Steering Group;" (5) supervise the Executive Secretariat's activities; and (6) "represent the Steering Group and, where appropriate and in coordination with co-chairs, the Department to external audiences on MDM-related matters." App'x 70–71, ¶ 90.

Jankowicz had no authority to censor or surveil. The charter did not contemplate any direct engagement with MDM. Instead, her responsibilities reflected the internal nature of the Board's function. At most, responsibility (6) contemplated the possibility that Jankowicz would have meetings and make educational appearances to discuss policy or make educational presentations as the Press Secretary described. Accordingly, the charter showed that operational components were the only parts of DHS with authority to engage in what Fox called censorship.[3]

Fox continued to disregard every new piece of information as it repeated various renditions of the same false claims about Jankowicz. *See, e.g.*, App'x 74, ¶ 100; 76, ¶ 102.

---

[3] Earlier this year, the Supreme Court repudiated this conspiracy theory altogether, even as to operational components of DHS and other agencies. *See infra* Argument § II(C)(1)(ii).

**D. Jankowicz's writing and public remarks denounce censorship.**

Jankowicz's published writings make clear that she believes censorship is ineffective and dangerous. App'x 38, ¶ 24. In her book, Jankowicz makes that point expressly, which is echoed and attributed to her in a Wilson Center policy paper, readily accessible online. *Id.*

Referring to Jankowicz, Fox proclaimed: "If you don't want your fellow citizens to have the right to share their views, you're necessarily an extremist and shouldn't be anywhere near the levers of government." App'x 53, ¶ 50. But even a cursory examination of her writings, statements, and positions confirm her opposition to censorship.

**E. Fox engages in a campaign of false coverage about Jankowicz without acknowledging or incorporating new information.**

From late April through December 2022, Fox repeated its false statements about Jankowicz despite being aware of each development that called their previous statements into question.

Fox's false statements about Jankowicz fell into three categories. <u>First</u>, Fox falsely claimed that Jankowicz had the authority and desire to directly surveil and censor Americans' speech, even to the point of threatening their physical safety and liberty. *See infra* § I(F). <u>Second</u>, even after reporting that Jankowicz had resigned, Fox falsely stated that she was fired. *See infra* § I(H). <u>Third</u>, Fox claimed Jankowicz was affiliated with and supportive of a tool to "edit [] tweets" on the social media

site formerly known as Twitter, even falsely stating that she had a role in "pitch[ing]" this tool despite her complete lack of affiliation with Twitter. *See infra* § I(I).

### F. Fox's statements about Jankowicz and the Board were false.

Fox made false statements about Jankowicz and the Board's authority, intentions, and the fabricated threat she posed to Americans' free speech. Some were specific and some were general.

The specific claims related to supposed censorship, surveillance, and physical threat to Americans.

### 1. Fox specifically and falsely stated that Jankowicz could censor Americans.

On April 29, 2022, Carly Shimkus said Jankowicz is "lead[ing] a government board in charge of deciding what we can and cannot say." App'x 51, ¶ 46. On May 3, Brian Kilmeade said that Jankowicz's "purview" included the ability to "suspend []" accounts" and "stop people from reading" them. App'x 62, ¶ 67. On May 13, United States Representative Jeff Van Drew, appearing on Fox, said Jankowicz is "going to actually be taking things off [of the internet], and leaving other things on that aren't truthful, and we've seen that before." App'x 64, ¶ 72. On May 20, Victor Davis Hanson said Jankowicz "was going to adjudicate what 330 million people could say based on her view of disinformation." App'x 67, ¶ 82. On June 9, Elizabeth MacDonald said Jankowicz was "going to coordinate with Twitter, federal, state, and

local tribal groups, to basically censor things about the origin of the pandemic, masking, and much more." App'x 72, ¶ 95.

These statements were false. Neither the Board nor Jankowicz could decide what anyone could say, take anything off the internet, suspend any account, or otherwise cause any external actors to censor anyone.

### 2. Fox specifically and falsely stated that Jankowicz could surveil Americans.

Fox also repeatedly stated that Jankowicz could surveil Americans. On April 29, 2022, United States Representative Andy Biggs, appearing on Fox, claimed Jankowicz will "head this bureau [the Board] that's going to spy and target Americans." App'x 52, ¶ 48. On May 2, Sean Hannity said the Board "gets used and abused to monitor Americans' communications." App'x 61, ¶ 66. On May 10, Deroy Murdock wrote on Fox's website that the Board "monitors public utterances, condemns them as 'disinformation' and then flags them for dutiful erasure" by companies in Silicon Valley. App'x 63, ¶ 69. On May 18, Harris Faulkner said the Board was "designed to monitor what we all say and do," making Jankowicz the supposed implementer of that design. App'x 66, ¶ 81.

These statements were false. Neither the Board nor Jankowicz could spy on, target, monitor, or flag anyone's speech.

### 3. Fox specifically and falsely stated that Jankowicz was a physical threat to Americans' safety and liberty.

Fox went even further, stating that Jankowicz could use force to harm or imprison Americans. On April 30, 2022, Brian Kilmeade said that Jankowicz will "be telling you what's true and what's not—maybe you'll go to jail." App'x 55, ¶ 53. On May 2, Tucker Carlson said the Board was "controlling what you say" and that Jankowicz is "a law enforcement official that works for the biggest law enforcement agency in the country with stockpiles of ammo to the tune of millions of rounds per year." App'x 60, ¶ 64. On May 12, Representative Jim Jordan said if "you try [to talk]" then "Nina Jankowicz will come after you." App'x 64, ¶ 70.

These statements were false. Neither the Board nor Jankowicz had the power to jail anyone, physically harm anyone, or control what anyone said with the threat of force.

### 4. When Fox called Jankowicz a censor and the "Minister of Truth," it was invoking its other statements about her.

While masterminding this fantasy about Jankowicz's authorities, intentions, and threats to Americans and their free speech, Fox browbeat its audience with references to Jankowicz as a censor, the Minister of Truth, and other similar characterizations.

On April 28, 2022, Tucker Carlson told viewers that the Board would "get men with guns to tell you to shut up" and that Jankowicz was "in charge of policing

speech" and had "plans to censor you from saying what you think is true." App'x 48, ¶ 40. The same day, Laura Ingraham said Jankowicz would "protect you from free expression" and was "the administration's purveyor of truth." App'x 49, ¶ 42. On April 30, 2022, Will Cain said Jankowicz was "chosen to . . . tell us all what is and is not true." App'x 48, ¶ 39.

On May 2, Dan Bongino said Jankowicz was an "unhinged … Minister of Truth" who would police Americans' speech. App'x 47, ¶ 38. The same day, just after saying the Board would "monitor Americans' communications," Sean Hannity called Jankowicz "our new disinformation minister." App'x 61–62, ¶ 66. Hannity's guest Sandra Smith added that Jankowicz will be "deciding what qualifies as the truth." App'x 62, ¶ 66. On May 10, Will Cain said she "would be in charge of shutting anyone down who dared to question her disinformation." App'x 63, ¶ 69.

In December, while discussing the Board, Tucker Carlson said "[w]e're learning a lot more about what they plan to do, and in fact have done, to censor the speech of Americans," claiming that Jankowicz had actually censored Americans. App'x 76, ¶ 102. Of course, she had not and could not.

In context, these statements invoked and reinforced the specific false claims Fox made about Jankowicz's authority as Executive Director of the Board.

**G. Statements about the Board directly referred to Jankowicz.**

Fox also regularly referenced Jankowicz and the Board interchangeably and discussed the Board while displaying Jankowicz's photo for minutes at a time.

For example, on April 29, 2022, Sean Hannity said the Board was "in charge of policing disinformation" and that Jankowicz was "the person that polices your thoughts" while showing her photo over the words "DISINFORMATION GOVERNANCE BOARD." App'x 50, ¶ 44. The same day, Fox posted a Tucker Carlson quote on Twitter calling the Board "a full-scale attack on free speech." App'x 51, ¶ 45. Another contributor described the Board's "goal" as "to encourage censorship" while Jankowicz's government portrait was on screen. App'x 52, ¶ 49.

On April 30, Senator Marsha Blackburn said that the Board was created "to allow the Biden administration to censor political free speech." While she spoke, Jankowicz's photo was displayed in a larger format than the speaking Senator. App'x 54, ¶ 52. On May 2, Kara Frederick said that the Board should not exist because it would "target normal ordinary Americans simply for having a voice." App'x 61, ¶ 65. Jankowicz's portrait was on screen.

On May 18, with Jankowicz's photo on screen, Sean Hannity said the Board was "a brand-new Ministry of Truth that we've been talking about to police all your thoughts." App'x 66–67, ¶ 81. The same day, Harris Faulkner said the Board would "cancel you if you don't believe what we [the Board] want you to believe." App'x

66–67, ¶ 81. Lisa Kennedy Montgomery said the Board was a "form of thought control" and an "Orwellian government agency designed to monitor what we all say and do" with "the right to decide what is true and what is false." App'x 66, ¶ 81.

On May 23, Katie Pavlich said the Board would decide "what is true and what is false" and this would "cause them to engage in censorship." App'x 69, ¶ 86. Other Fox commentators used the same "deciding what is the truth" falsehood about Jankowicz specifically. App'x 62, ¶ 66; *see also* App'x 51, ¶ 46.

 On June 9, when discussing the Board's charter, Elizabeth MacDonald said DHS was "planning a bigger censorship campaign push by the now-defunct disinformation board than anyone realized." App'x 72, ¶ 95. Trace Gallagher said the "board was meant to control the speech of Americans." App'x 73, ¶ 97. On June 16, Lisa Kennedy Montgomery called the Board "an Orwellian thought police force." App'x 73, ¶ 98. References to Orwell and the Ministry or Minister of Truth were also used in false claims about Jankowicz specifically. *See, e.g.*, App'x 47, ¶ 38.

In November 2022, Jesse Watters said that they "didn't want … [Jankowicz] censoring us" and Sean Hannity added that the Board was a "department dedicated to working with the social media giants for the purpose of policing information." App'x 74, ¶ 100. Jankowicz's photo was on screen throughout.

### H. Even after reporting her resignation, Fox made false statements claiming Jankowicz was fired.

After Jankowicz resigned, Fox acknowledged that she had resigned. App'x 86–87, ¶ 120. A DHS spokesperson confirmed her resignation and said that "Nina Jankowicz has been subjected to unjustified and vile personal attacks and physical threats." App'x 65–66, ¶ 78. DHS had asked Jankowicz to remain with the agency. App'x 65, ¶ 75.

But Fox was intent on kicking Jankowicz while she was down. On May 20, 2022, Jesse Watters said that Jankowicz "got booted this week." App'x 87, ¶ 122. On October 12, Watters said that DHS Secretary Mayorkas "had to yank" Jankowicz. App'x 87, ¶ 123. And on November 19, Tucker Carlson said "the Biden administration had to <u>fire</u> Jankowicz." App'x 88, ¶ 124 (emphasis added). Later that day, Carlson said she "had to go away." App'x 88, ¶ 124.

These statements were false. Jankowicz resigned, and DHS had articulated why she resigned: because of the threats created by Fox.

### I. Fox falsely claimed that Jankowicz was involved in advocating for a Twitter tool that could edit other users' tweets.

Looking for more opportunities to villainize Jankowicz, Fox used a heavily-edited video clip sourced from a recorded Zoom meeting in late January 2021 to falsely assert that Jankowicz had advocated for and endorsed a feature on Twitter. App'x 76, ¶¶ 104–05. The event hosts asked Jankowicz about this Twitter pilot

program, "Birdwatch," later called "Community Notes." App'x 77–78, ¶¶ 106–08.
Jankowicz explained that Twitter planned to allow verified users to "add context to certain tweets,"—a "Wikipedia model." *Id.* She said, among other things, "I haven't looked into this … because it just came out," "I like the idea of adding more context to claims and tweets and other content online, rather than removing it," said she did not plan to participate in using the tool, and said "I'm not sure it's the solution." App'x 77–78, ¶ 108.

Fox whittled the video to a ten-second soundbite and falsely asserted that Jankowicz "wants to edit your tweets," that it was "her fix to Twitter," that she "pitched the idea" of Birdwatch, and that she wanted to "get[] rid of [] information" on Twitter. App'x 81–84, ¶¶ 114(a)–(g). Even after the Associated Press published an article refuting these claims, App'x 85, ¶ 117, Fox continued, *see, e.g.*, App'x 84, ¶ 114(h). These claims were all contrary to Jankowicz's remarks in the full video.

### J. Fox's audience understood Fox's coverage to be factual and, as a result, believed Jankowicz was a threat worthy of relentless harassment.

Fox's audience understood Jankowicz to be a censor who would surveil and threaten them—someone akin to infamous Nazi propagandist Joseph Goebbels.

Fox's audience communicated its understanding by harassing and threatening Jankowicz and her family.

Among the representative examples of what Jankowicz endured, on April 28, 2022, individuals online posted Tucker Carlson's coverage of Jankowicz and the Board, writing, among other things, "Mayorkas is Jewish. Jankowitz [sic] is also Jewish. Coincidence?" and "Time to kill them all." App'x 90–91, ¶ 130.

For months, people wrote to Jankowicz encouraging her to commit suicide. For example, on April 28, an individual sent Jankowicz a Facebook message telling her to hang herself. App'x 92, ¶ 132; *see also* App'x 97–98, ¶ 138 (February 2023). On April 29, another person wrote to Jankowicz: "Kill yourself you subhuman sack of shit. Leftist rodents like you specialize in lies." App'x 93, ¶ 134.

Others called for and threatened violence against Jankowicz and her family. On April 29, someone emailed Jankowicz's Syracuse University account—where she was an adjunct professor—comparing her to Joseph Goebbels and musing whether her "end [will] be similar to his? We shall see." App'x 92–93, ¶ 133. On May 5, a Twitter user told Jankowicz to "Quit your job before we destroy your life. Everything you've ever cared about will be taken from you." App'x 94, ¶ 136. On May 15, another Twitter user said "Jankowicz is a traitor to We The People USA and should be publicly executed." App'x 95, ¶ 137. On June 1, someone else posted an image of several firearms needed "For Tyranny" alongside Jankowicz's username.

App'x 97, ¶ 137. These were not idle online threats. For months after her resignation, Jankowicz was followed on the street, photographed, and had her location shared online in real time. App'x 103–104, ¶ 147.

After ongoing anonymous calls for Jankowicz to be doxed,[4] App'x 100–102, ¶ 142, someone posted her home address and details about her and her family online. App'x 102, ¶ 143. Others used this information to make threats against Jankowicz's mother, husband, and infant son. App'x 102, ¶ 143. An individual self-identifying as a "journalist" began to contact, harass, and stalk Jankowicz in May 2022. App'x 105–106, ¶ 154. She was forced to hire an attorney and pursue a protective order, which courts in Virginia granted. App'x 105–106, ¶ 154.

The resulting expense was substantial and the emotional weight immense. Jankowicz was forced to hire an investigator and security consultant, who advised her in May 2022 that staying in her own home was unsafe. She was weeks from giving birth. App'x 102, ¶ 144. She had to hire attorneys to defend her against multiple meritless lawsuits inspired by Fox's false coverage. App'x 105, ¶¶ 152–53.

Fox's audience also showed that it believed Fox's other false claims about Jankowicz, including that she was fired. For example, on May 19, a Facebook user

---

[4] Doxing refers to the online publication and widespread disclosure of an individual's personally identifying information.

sent Jankowicz a message saying "You got fired. The entire country dislike you. Bye bye C[***]." App'x 99, ¶ 140.

## II.   <u>Procedural History</u>

Jankowicz filed her complaint in the Superior Court of Delaware on May 10, 2023. App'x 25. Fox removed to the District Court on May 11, 2023. *Id.* On June 20, 2023, the parties submitted a stipulation and proposed order, which the District Court granted the next day, agreeing that Jankowicz was a public figure for purposes of demonstrating actual malice. App'x 27. Jankowicz amended her complaint on August 3, 2023. App'x 28. Fox moved to dismiss the amended complaint on August 31, 2023. *Id.* Jankowicz filed her opposition to the motion on September 25, 2023. No. 1:23-cv-00513-CFC (D. Del.), ECF no. 32 (hereinafter "Opp'n Br.").[5] Fox filed a reply brief on October 16, 2024. App'x 28. Fox requested oral argument on the motion, which the District Court did not schedule. App'x 29.

The District Court issued a memorandum and separate order granting Fox's motion on July 22, 2024. App'x 29. Jankowicz noticed this appeal on August 20, 2024. *Id.*

---

[5] Although not reproduced in the appendix, Appellant's brief in opposition to the motion to dismiss is part of the record on appeal. *See* Fed. R. App. P. 10(a)(1).

## III.    The decision presented for review

The decision at issue in this appeal is the District Court's memorandum granting Fox's motion to dismiss. App'x 3–20. The District Court summarized the Complaint's allegations, explaining briefly who Jankowicz is and the general categories of statements she alleged were defamatory without listing the statements at issue. App'x 3–4.

Out of underline more than fifty statements the Complaint quotes and alleges were defamatory statements about Jankowicz's role with the Board, *see* App'x 47–55, ¶¶ 38–53; 60–65, ¶¶ 64–73; 66–67, ¶¶ 81–82; 69, ¶ 86; 72–76, ¶¶ 95–102, the District Court analyzed <u>two</u> statements, *see* App'x 8 (citing App'x 74–75, ¶ 100), 13 (citing App'x 64, ¶ 72). Based on these two statements, the District Court granted the motion for all other statements in this category for two proffered reasons: the statements were opinion and/or true.

As to opinion, the District Court relied on selected dictionary definitions and no surrounding context to conclude that all statements in the Complaint about the Board and Jankowicz's role "lack[] readily understood precise meaning." App'x 11–12. The District Court also concluded that statements relating to Jankowicz's future actions and intentions were incapable of being proven false and are therefore categorically not actionable. App'x 13. And the District Court concluded that its identified statements were necessarily opinions because the Board was "a

hypercharged subject of political debate" such that viewers would expect opinions. App'x 13–15.

As to truth, the Court relied on three paragraphs of the charter out of context and the Merriam-Webster Dictionary to conclude that Fox's statements were true. *See* App'x 8–10, 12, 17.[6]

Regarding Jankowicz's resignation and Fox's statements the Complaint identified as falsely claiming she was fired, the District Court evaluated five of the six statements in the Complaint and concluded they were opinions and/or true. App'x 15, 17–18. The District Court determined that statements like "got booted" and "had to yank [Jankowicz]" were "inherently imprecise." App'x 15. The District Court also decided that the alternative role Jankowicz had been offered as a policy advisor at DHS was a "lesser position" that was "tantamount to being demoted or dismissed" even though there was no allegation that it was a "lesser position." App'x 18. The District Court referenced the Merriam-Webster Online Dictionary definition of the word "Fire" to conclude that being offered a policy advisor position was equivalent. *Id.*

Regarding statements the Complaint alleged to be false related to Jankowicz's relationship with Twitter's Birdwatch, the District Court concluded those statements

---

[6] Nowhere in the charter is the Board authorized to "examine citizens' speech" or "identify 'misinformation,' 'disinformation,' and 'malinformation'" as the District Court purported to summarize. App'x 17.

were true because "the Complaint alleges that Jankowicz stated 'during a Zoom meeting' that she 'like[d] the idea' of 'verified people' 'edit[ing]' Twitter." App'x 19. The District Court did not address statements identified in the Complaint, which are not reinforced or verified by that quote.

The District Court noted it was not addressing any other arguments the parties had raised. App'x 19.

## SUMMARY OF ARGUMENT

The District Court, in essence, committed one error that permeated every issue it reached and made each of its holdings erroneous. Despite invoking the Supreme Court and this Court's well-established rules for the standard of review on a motion to dismiss, the District Court failed to accept Jankowicz's well-pleaded allegations as true, failed to draw all inferences from those allegations, and failed to draw inferences in her favor. Instead, the District Court rejected the truth of Jankowicz's allegations, drew its own inferences not based on the Complaint, and drew inferences in Fox's favor. This is not the appropriate standard of review. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 194–5 (2024) (court could only reach the conclusions it did "by taking the allegations in isolation and failing to draw reasonable inferences in the [plaintiff's] favor in violation of this Court's precedents").

This Court, assessing Jankowicz's allegations under the proper standard, must reverse and remand for further proceedings because she has adequately stated a claim for defamation against Fox for six reasons.

First, Jankowicz plausibly showed that Fox's statements in the Complaint were not opinions. The District Court's analysis ignored most statements alleged in the Complaint, many of which included specific and precise claims about what Jankowicz would be doing as Executive Director of the Board, claims she was fired, and claims she was involved in or "pitched" Birdwatch.

Second, Jankowicz plausibly alleged that statements about the Board were impliedly statements about her, making them actionable in this case. Fox repeatedly discussed the Board and Jankowicz interchangeably, and repeatedly displayed her photo prominently on screen even when her name was not spoken.

Third, Jankowicz plausibly alleged that Fox's statements were false. The District Court relied on its own view of the allegations, drew inferences from outside the allegations, and drew inferences in Fox's favor.

Fourth, Jankowicz plausibly alleged that Fox's false statements were made with actual malice.

Fifth, Jankowicz plausibly alleged that by impugning her professional reputation and accusing her of violating the law, Fox's false statements were defamation *per se*.

Sixth, Jankowicz plausibly alleged that Fox's false statements were actionable against Defendant-Appellee Fox Corporation.

In sum, as this Court has said, "courts cannot inject evidentiary issues into the plausibility determination" on a motion to dismiss. *Schuchardt v. President of the United States*, 839 F.3d 336, 347 (3d Cir. 2016). And as the Supreme Court has said, courts cannot adopt the defendants' view of the facts alleged in the Complaint, even if the court considers it an "obvious alternative explanation" for the alleged conduct. *Vullo*, 602 U.S. at 195. The District Court made these errors and others throughout its decision. This Court must reverse and remand.

## **ARGUMENT**

### I.     **The usual *Iqbal* standard governs Fox's motion.**

#### **A. The District Court failed to adhere to the well-established standard for evaluating factual allegations on a motion to dismiss.**

Failing to credit a plaintiff's well-pleaded allegations at the motion to dismiss stage is legal error. *See Flora v. Cnty. of Luzerne*, 776 F.3d 169, 175–76 (3d Cir. 2015) (reversing because "[r]ather than accepting the facts alleged in the complaint as true, the District Court in effect made factual determinations. . . . In doing so, it erred"); *see also Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011), *as amended* (Oct. 7, 2011) (it would be "inappropriate for the District Court . . . to assess independently the credibility of allegations" under Rule

12(b)(6)). A reviewing court must assume the truth of all factual allegations, "construe those truths in the light most favorable to the plaintiff, and then draw all reasonable inferences from them." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 791 (3d Cir. 2016) (vacating dismissal under Rule 12(b)(6)). The Supreme Court consistently holds the same. *See, e.g.*, *Vullo*, 602 U.S. at 194–95.

Despite reciting the correct standard, the District Court wrongly over-relied on a phrase from *Iqbal* that has appeared in no other Supreme Court opinion since, substituting its own "judicial experience and common sense," App'x 5–6 (quoting *Iqbal*, 556 U.S. at 679)), for Jankowicz's "'well-pleaded factual allegations' and 'reasonable inference[s]' therefrom," *Vullo*, 602 U.S. at 181 (quoting *Iqbal*, 556 U.S. at 678–79).

This is flatly the wrong approach. "'[E]ven if it strikes a savvy judge that actual proof of those facts alleged is improbable and that a recovery is very remote and unlikely[,]' . . . [t]he proper place to resolve factual disputes is not on a motion to dismiss, but on a motion for summary judgment." *Doe*, 30 F.4th at 342 (quoting *Fowler*, 578 F.3d at 213). Courts must set aside personal inclinations and intuitions regarding a plaintiff's factual allegations at this stage. *See, e.g.*, *Erie Ins. Exch. v. Md. Ins. Admin.*, 105 F.4th 145 (4th Cir. 2024) ("[A] district court applying Rule 12(b)(6) . . . <u>cannot</u> make factual findings.") (emphasis in original). Indeed, the only allegations not entitled to a presumption of truth are those without sufficient "factual

matter" making them more akin to conclusory assertions of fact or legal conclusions. *Iqbal*, 556 U.S. at 679. If the allegations are facially plausible, the presumption of truth applies and all favorable inferences must be drawn in the plaintiff's favor. *See Connelly*, 809 F.3d at 790.

This was the District Court's fundamental error. Drawing on sources outside the Complaint and making factual determinations in Fox's favor, the District Court failed to credit Jankowicz with the truth of her factual allegations and drew inferences against her.

### B. No heightened pleading standard applies to Jankowicz's defamation claim.

Separately, the District Court correctly determined that Fox waived any argument that New York's anti-SLAPP statute, N.Y. Civil Practice Law & Rules § 3211(g)(1), should apply and so did not reach whether § 3211(g)(1) would apply. App'x 6. While this Court need not reach that question, it is important to emphasize that neither New York's anti-SLAPP statute nor any other heightened pleading standard applies in this case. Most Circuits that have considered the question have held that the usual Rule 12(b)(6) standard applies to defamation claims in federal court as it does to any other civil claim. *See La Liberte v. Reid*, 966 F.3d 79, 83 (2d Cir. 2020); *Klocke v. Watson*, 936 F.3d 240, 245 (5th Cir. 2019); *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1352 (11th Cir. 2018); *Los Lobos Renewable*

*Power, LLC v. Americulture, Inc.*, 885 F.3d 659, 662, 672–73 (10th Cir. 2018); *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1333–34 (D.C. Cir. 2015).

Consistent with that precedent, district courts in this Circuit scrupulously adhere to *Twombly* and *Iqbal* even when evaluating merely colorable defamation claims on a motion to dismiss. *See, e.g.*, *Schatzberg v. State Farm Mut. Auto. Ins. Co.*, 877 F. Supp. 2d 232, 240–45 (E.D. Pa. 2012) (*Twombly* applies "to all civil cases" and so denying motion to dismiss even where defendants offered alternative context or where statements were only "barely" capable of defamatory meaning) *Forrest v. Owen J. Roberts Sch. Dist.*, No. 09-cv-3014, 2011 WL 1549492, at *1, *17–18 (E.D. Pa. Apr. 1, 2011) (same); *Rapid Cirs., Inc. v. Sun Nat. Bank*, No. 10-cv-6401, 2011 WL 1666919, at *2–3, *11–14 (E.D. Pa. May 3, 2011) (same). The District Court's decision in this case is the erroneous outlier.

## II.    Jankowicz states a claim for defamation.

Under New York law, a defamation claim requires (1) a statement about the plaintiff, (2) published to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) per se actionability or special damages. *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). To determine whether a statement is capable of being false and therefore actionable, courts distinguish "between statements of fact, which may be defamatory, and expressions of opinion, which are not defamatory."

*Jacob v. Lorenz*, 626 F. Supp. 3d 672, 690 (S.D.N.Y. 2022) (cleaned up). And because Jankowicz is a public figure, the actual malice standard applies.

Jankowicz plausibly alleged that Fox's false statements about her, the Board, her departure from DHS, and Birdwatch are actionable and false statements of fact. She plausibly alleged that those statements were made with actual malice. And she plausibly alleged that they were defamation *per se*. Accordingly, Jankowicz stated a claim for defamation.

The District Court erred in its approach to fact-or-opinion analysis, and we start there.

### A. Fox's statements about Jankowicz are actionable false statements of fact.

To determine whether a statement is a non-actionable opinion, courts evaluate:

(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication … [or the] surrounding circumstances are such as to "signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact."

*Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 153 (1993) (cleaned up). Ultimately, "the dispositive question is whether a reasonable listener . . . could have concluded that [the speaker] was conveying facts about the plaintiff." *600 W. 115th St. Corp. v. Von Gutfeld*, 603 N.E.2d 930, 934 (N.Y. 1992).

"Simply couching such statements in terms of opinion does not dispel [false implications of fact.]" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990). Relevant here, statements susceptible to being understood to impute "specific criminal or other wrongful acts" are actionable defamation. *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 64 (2d Cir. 1980). Moreover, when a statement contains a "provably false factual connotation," it is not subject to "full constitutional protection," even when it is "a statement of opinion relating to matters of public concern." *Milkovich*, 497 U.S. at 20; *see also Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 381–82 (N.Y. 1977) (statements that plaintiff was "probably corrupt" and his sentences "were suspiciously lenient," carried "strong undertones of conspiracy and illegality," and thus rested on "different footing" than opinions).

Addressing each of the three elements of *Gross*'s opinion-or-fact analysis, the three categories of statements identified in the Complaint are actionable.

### 1. Fox's statements about Jankowicz and the Board have precise and factually false meaning.

Fox's statements about Jankowicz's role as Executive Director and what the Board (through her) would do are actionable statements. Fox's portrayal of Jankowicz and the Board's authority, intentions, and the fabricated threat they posed to Americans' free speech made both specific and general factual claims that were false. The specific claims fell into three categories, all of which are actionable.

###### i. Fox made specific claims about how Jankowicz would "censor" Americans.

First, Fox made false and specific statements about Jankowicz's capability and desire to censor Americans. These included, *inter alia*, claims that she would "actually be taking things off [of the internet]," App'x 64, ¶ 72, could "suspend []" accounts" and "stop people from reading them," App'x 62, ¶ 67, and would "coordinate with Twitter, federal, state, and local tribal groups, to basically censor things about the origin of the pandemic, masking, and much more." App'x 72, ¶ 95.[7] Each of these statements make the specific claim that Jankowicz had both the authority and ability to censor Americans. The Complaint alleges that these statements were false—and could be proven false in discovery because neither Jankowicz nor the Board had any ability to take things off the internet, suspend accounts, stop people from reading anything, or coordinate with external groups to censor things about the pandemic.

###### ii. Fox made specific claims about how Jankowicz would "surveil" Americans.

Second, Fox made false and specific statements about Jankowicz's authority to surveil Americans. These included, *inter alia*, claims that the Board would "spy and target Americans," App'x 52, ¶ 48, would "monitor Americans'

---

[7] For other representative examples of this kind, *see supra* Statement of Facts § I(F)(1).

communications," App'x 61–62, ¶ 66; *see also* App'x 63, ¶ 69, 66–67, ¶ 81, and could "flag them for dutiful erasure," App'x 63, ¶ 69.[8] Again, these statements make specific claims about Jankowicz's authority and capability. Each was false—and could be proven false in discovery because the Board had no ability to "flag" statements for "erasure," and no ability to spy on, target, or monitor anyone. Indeed, the New York Times quoted a former DHS official who said so explicitly. App'x 58, ¶ 60.

### iii.   Fox made specific claims about how Jankowicz would physically harm or imprison Americans.

Third, Fox made false and specific statements about Jankowicz's capability to physically harm or imprison Americans. These included, *inter alia*, claims that Americans might "go to jail" based on what Jankowicz said was "true and what's not," App'x 55, ¶ 53, claims that Jankowicz was a "law enforcement official that works for the biggest law enforcement agency in the country with stockpiles of ammo to the tune of millions of rounds per year" who would be "controlling what you say," App'x 60, ¶ 64, and in days after that coverage, claimed Jankowicz "will come after you" if "you try [to talk]," App'x 64, ¶ 70.[9] Again, these statements make specific claims about what Jankowicz could do and wanted to do in her capacity as

---

[8] For other representative examples of this kind, *see supra* § I(F)(2).

[9] For other representative examples of this kind, *see supra* § I(F)(3).

Executive Director of the Board. Each was demonstrably false because discovery would show the Board had neither the authority nor the capability to imprison anyone, direct the use of firearms or ammunition, or otherwise target Americans for their speech.

### iv. The District Court's erroneous analysis ignored most allegations in the Complaint, instead focusing on a context-stripped analysis of the word "censor."

The District Court ignored these statements, which have apparent and precise meanings.[10] Courts considering defamation claims under New York law have found similar statements actionable that "convey, at a minimum, serious impropriety and, at worst, criminal behavior" about a public official. *Loder v. Nied*, 932 N.Y.S.2d 546, 549 (N.Y. App. Div. 2011) (planning board chair accused of "giving favors"); *see also Krusen v. Moss*, 105 N.Y.S.3d 607, 610 (N.Y. App. Div. 2019) (politician accused of "pilfering free gas from taxpayers"); *Greenberg v. Spitzer*, 62 N.Y.S.3d 372, 379 (N.Y. App. Div. 2017) (plaintiff accused of "defraud[ing] the market").

Instead, the District Court erroneously dismissed Jankowicz's claim by concluding all of Fox's statements were opinions because: (1) some statements referred to Jankowicz's intentions or plans, which the District Court concluded were

_____

[10] The District Court therefore committed reversible error as to these statements even if this Court agreed with the District Court's conclusions about the word "censor."

*per se* non-actionable; and (2) the word "censor" was too vague to be capable of defamatory meaning. The District Court was wrong on both points.

In analyzing statements that asserted Jankowicz's plans and intentions, the District Court misapplied New York law, citing the 1989 decision, *Immuno AG v. Moor-Jankowski*. App'x 13 (citing 549 N.E.2d 129 (N.Y. 1989)). But in 1991, New York's highest court superseded that decision in *Immuno AG v. Moor-Jankowski*, 567 N.E.2d 1270 (N.Y. 1991) (*Immuno AG II*). In *Immuno AG II*, the New York Court of Appeals applied *Milkovich* to hold that a forward-looking statement that the "plaintiff <u>will</u> release possible carrier-chimpanzees who <u>may</u> endanger the wild population" was actionable. *Id.* at 1276 (emphasis added);[11] *see also, e.g.*, *NOVAGOLD Res., Inc. v. J Cap. Rsch. USA LLC*, No. 20-cv-2875, 2022 WL 900604, at *4–5 (E.D.N.Y. Mar. 28, 2022) (denying motion to dismiss claim about statement defendants argued was "nonactionable prediction of the future"). Furthermore, the District Court misinterpreted many of the statements as purely tied to Jankowicz's future motivations. Many statements made claims about her existing authorities and what she would do with those existing authorities in the future.

And in evaluating whether Fox's statements were actionable, the District Court focused exclusively on descriptions of Jankowicz as a "censor" (or the

---

[11] *Immuno AG II* was cited for this proposition in Jankowicz's brief below. *See* Opp'n Br. 17, 19.

"Minister of Truth" or the Board as the "Ministry of Truth"). Not only did that analysis ignore all the other statements described above, but it wrongly stripped these terms of context by doing so. *See, e.g.*, *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 721–22 (S.D.N.Y. 2014) (statements using "illegally," "scheme," and "illicit" were actionable because context showed defendants sought to "establish the existence of Plaintiffs' 'scheme'").

Courts have found far vaguer words—like "rogue" and "dubious"—actionable because in context they "accuse [plaintiff] of a defined course of conduct" that "through discovery, can be proven or disproven." *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 285 & n.17 (S.D.N.Y. 2016); *Sunshine Sportswear & Elecs., Inc. v. WSOC Television, Inc.*, 738 F. Supp. 1499, 1506 (D.S.C. 1989) ( "scam," "rip-off," and "bait and switch" actionable in context); *Baker v. Galusha*, 981 N.Y.S.2d 198, 200 (N.Y. App. Div. 2014) (Town Supervisor accused of "unscrupulous dealings" including "possible unlawful abuse of that office").

Instead of following that well-tread approach to analyzing defamation claims, the District Court turned to dictionary definitions Fox offered in support of its motion to conclude that words like "censor," "suppress," and "police," had diffuse meanings. App'x 8. In fact, the District Court determined those definitions were the only plausible understanding of those words—and did not consider Jankowicz's

plausible allegations that these generalized terms were tied to the specific factual claims Fox had made. *See* App'x 8, 12. That was error. *See Karedes v. Ackerly Grp., Inc.*, 423 F.3d 107, 113 (2d Cir. 2005) ("[W]here the words can be construed as having more than one meaning, only some of which are potentially defamatory, it is for a jury to select among those meanings."); *Hatfill v. N.Y. Times Co.*, 416 F.3d 320, 331 (4th Cir. 2005); *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 178 (2d Cir. 2000); *cf. Johnston v. Borders*, 36 F.4th 1254, 1273 (5th Cir. 2022) (same under Florida law).

Context matters. A single utterance in the heat of the moment, for example, might be distinct from a monthslong campaign of coverage. The latter suggests "Defendants presumably meant what they said and intended their words to be understood in accordance with their plain meaning." *Restis*, 53 F. Supp. 3d at 721. Fox used these terms day in and day out across news and other programming to tell its viewers that Jankowicz could and would use the Board to monitor and surveil them, close their accounts or accounts they read, remove online commentary, and threaten Americans with imprisonment or bodily harm. The District Court's reasoning would permit courts to read individual words in a vacuum and ignore others in defendants' favor.

## 2. Fox's statements about Jankowicz and the Board are objectively verifiable as false.

Fox's statements are also objectively verifiable—i.e., "capable of proof or disproof." *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 925 N.Y.S.2d 407, 412 (N.Y. App. Div. 2011) (quoting *Ollman v. Evans*, 750 F.2d 970, 981 (D.C. Cir. 1984)). A statement is susceptible to objective verification if a contrary statement has "already been transmitted across . . . [the] airwaves, thus contradicting defendant's story." *Prozeralik v. Capital Cities Commc'ns, Inc.*, 626 N.E.2d 34, 41 (N.Y. 1993).

Fox's statements about Jankowicz were refuted publicly, and Fox continued to lie. Current and former officials made clear that the Board had no operational authority. App'x 55–59, ¶¶ 54–61. These refutations communicated that the disagreement at issue was factual. These were not policy or political disagreements. They were specific and repeated corrections about Jankowicz and the Board. *See supra* Statement of the Case § I(A).

Refutations of this sort are also indicative of verifiability because they can prove falsity. Fox has faced defamation claims in similar circumstances before, making statements after they were publicly debunked by government sources. *See US Dominion, Inc. v. Fox News Network, LLC*, 293 A.3d 1002, 1023–25 (Del. Sup. Ct. 2023).

### 3. The broader social context confirms Fox's statements about Jankowicz and the Board are actionable.

The context—both viewing the statements collectively and in the broader social context alleged in the Complaint[12]—further reveals that Fox's statements about the Board and Jankowicz's role are actionable. To identify "actionable factual assertions," courts consider the communication's content as a whole, including "its tone and apparent purpose." *Brian v. Richardson*, 660 N.E.2d 1126, 1129–30 (N.Y. 1995). Courts evaluate that "over-all context" to ask "whether the reasonable reader would have believed the challenged statements were conveying facts." *Id.* (quoting *Immuno AG II*, 567 N.E.2d at 1281).

Both the broader social context and the specific allegations in the Complaint show that Fox's audience believed these statements were conveying facts. No speculation is necessary on that point because thousands of Fox viewers began to harass, threaten, and abuse Jankowicz and her family, both online and in person, citing Fox's claims that she was a threat to their civil liberties. Although evidence of a defamatory statement's effect on the audience is "not dispositive," it offers insight into "the hypothetical reasonable [viewer]." *Tah v. Global Witness Publishing, Inc.*,

---

[12] New York courts break the third factor of the opinion analysis into two categories: (1) the communication's context; and (2) the broader social context. *See Sandals*, 925 N.Y.S.2d at 412. The communication's context, especially with respect to claims that Jankowicz was a censor and the like, is addressed above. *See supra* Argument § II(A)(1)(iv).

413 F. Supp. 3d 1, 11–12 (D.D.C. 2019), *aff'd*, 991 F.3d 231 (D.C. Cir. 2021); *see Gjonlekaj v. Sot*, 764 N.Y.S.2d 278, 474 (N.Y. App. Div. 2003).

The District Court also erroneously concluded that the broader context of Fox's programming including "commentary or a mix of commentary and news" made Fox's statements non-actionable. App'x 14. But that does nothing to change these factually false statements into opinions.

Many of the statements the Complaint identified appeared on programs that present themselves as news. App'x 46–55, ¶¶ 37–53; 60–65, ¶¶ 64–73. Many were even on <u>Fox Business</u>. *See, e.g.*, App'x 64, ¶ 72. Many claimed to rely on "evidence" such as the charter. *See, e.g.*, App'x 52, 54, 66, 81–85, ¶¶ 48, 52, 80, 114. But even if some hosts engage in commentary or mixed commentary and news, that does not provide talismanic immunity from liability. Indeed, Fox has made this argument before under New York law and failed. *US Dominion, Inc. v. Fox News Network, LLC*, No. N21C-03-257 EMD, 2021 WL 5984265, *28 (Del. Sup. Ct. Dec. 16, 2021) (rejecting Fox's attempt to dismiss defamation claim over statements it characterized as "commentary that used loose and hyperbolic rhetoric for entertainment value") (cleaned up).

### 4. Fox's statements claiming Jankowicz was fired are actionable.

Fox's statements claiming Jankowicz was fired are actionable. Most prominently, in the same day, Tucker Carlson said "the Biden administration had to

<u>fire</u> Jankowicz," App'x 88, ¶ 124 (emphasis added), and that she "had to go away." App'x 88, ¶ 124.[13] Jesse Watters said that Jankowicz "got booted," App'x 87, ¶ 122, and that DHS Secretary Mayorkas "had to yank" her. App'x 87, ¶ 123. But Jankowicz decided to resign instead of taking an offered policy advisor role.

These statements—whether or not they literally use the word "fire"—meant to convey that Jankowicz was fired when she was not. In its written reporting about Jankowicz's resignation, Fox referred only to Jankowicz resigning. App'x 65–66, ¶ 78. It is more than plausible to allege that saying someone "got booted" rather than resigning when offered an alternate position was precise and objectively verifiable.

Instead, the District Court concluded—without basis in the Complaint—that "viewer[s] would have expected the dismissal of a person in charge of an enterprise that had been 'paused' and whose very future was in question." App'x 18. Again, the District Court does not get to make that determination at this stage and erred.

### 5. Fox's statements claiming Jankowicz was involved in or associated with the Birdwatch feature on Twitter are actionable.

Fox's statements claiming Jankowicz was involved with Birdwatch are actionable. Fox's statements had precise meaning and are objectively verifiable. Put

---

[13] The District Court wrongly concluded that Jankowicz did not dispute Fox's argument that these statements were opinion. App'x 15. She did. Opp'n Br. 21–22, 26–27. The District Court also wrongly omitted Tucker Carlson's use of the word "fire" from its list of relevant statements. Each of these statements was cited in Jankowicz's brief. Opp'n Br. 3, 21–22, 26–27, 34.

simply, Jankowicz did not "want[] to edit your tweets," it was not "her fix to Twitter," she did not "pitch[] the idea" of Birdwatch, and she did not want to "get[] rid of [] information" as Fox claimed. App'x 81–84, ¶¶ 114(a)–(g). Jankowicz said, among other things, "I haven't looked into this … because it just came out," "I like the idea of adding more context to claims and tweets and other content online, rather than removing it," said she did not plan to participate in using the tool, and said "I'm not sure it's the solution." App'x 77–78, ¶ 108.

"A fabricated quotation may injure reputation in at least two senses, either giving rise to a conceivable claim of defamation." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 511 (1991). In the first, the quote attributes "an untrue factual assertion to the speaker," such as "a fabricated quotation of a public official admitting he had been convicted of a serious crime when in fact he had not." *Id.* In the second, the attribution causes reputational injury by indicating "a negative personal trait or an attitude the speaker does not hold." *Id.* (emphasis added). "[A]n exact quotation out of context can distort meaning, although the speaker did use each reported word." *Id.* at 515; *see also Price v. Stossel*, 620 F.3d 992, 1003 (9th Cir. 2010) (misleading use of clip "materially changed the meaning of the plaintiff's words"); *Franklin v. Daily Holdings, Inc.*, 21 N.Y.S.3d 6, 12–13 (N.Y. App. Div. 2015) (using plaintiff's out-of-context quote potentially defamatory).

The District Court erroneously concluded these statements were all about "Jankowicz's motivations and intentions" and therefore not actionable. This is wrong. *See supra* Argument § II(A)(1)(iv). Moreover, saying this is "her fix" or that she "pitched" it are not statements about motivation or intention.

At a minimum, Jankowicz plausibly alleged actionable meanings for these statements and that is enough. *See Block v. Tanenhaus*, 867 F.3d 585, 590 (5th Cir. 2017) ("Because the omission of context can distort the meaning of a direct quotation, there is a genuine fact issue as to whether the article misrepresented [plaintiff's] statements."); *Davis v. Ross*, 754 F.2d 80, 82–83 (2d Cir. 1985) (even if "words are susceptible of more than one meaning," determining "in what sense the words were used and understood" is for the factfinder).

### B. Jankowicz plausibly alleges Fox's statements were of and concerning her.

The District Court also erred by concluding that statements about the Board were not actionable by Jankowicz.[14] At the pleadings stage, a "plaintiff 'need only plead sufficient facts to make it plausible—not probable or even reasonably likely—

---

[14] The District Court wrongly concluded that Jankowicz only opposed Fox's arguments as to a single statement referencing the Board, rather than all of them. App'x 7–8. This was error. Jankowicz's argument referred to Fox's "flagrant[] use[] [of] Jankowicz's picture during segments that both impliedly and directly communicated falsehoods about her." Opp'n Br. 13. This section of the brief closes by saying that "viewers understood these <u>statements</u> to be about Jankowicz." Opp'n Br. 14 (emphasis added). The reference to one such statement as an example, Opp'n Br. at 13–14, does not waive as to others in a page-limited brief.

that a reader familiar with [plaintiff] would identify [her] as the subject of the statements at issue.'" *Palin*, 940 F.3d at 816 (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 105 (2d Cir. 2017)).

The Complaint shows Fox repeatedly used Jankowicz's photo when discussing the Board. App'x 48–49, ¶ 41; 50, ¶ 44; 52–53, ¶ 49; 54, ¶ 52; 61, ¶ 65; 66–67, ¶ 81; 74–75, ¶ 100. Fox often referenced the Board and Jankowicz in the same statement or the same segment. App'x 48–49, ¶¶ 40–41; 50, ¶ 44; 51–55, ¶¶ 46, 49, 52–53; 61–62, ¶¶ 65–66; 66–67, ¶ 81; 74–75, ¶ 100. In this context and at this stage, it is plausible to infer that viewers would take Fox's statements in the Complaint about the Board to be about Jankowicz.

### C. Fox's statements were false.

To be "fair and true," a publication must be "substantially accurate," which is when "despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth." *Zerman v. Sullivan & Cromwell*, 677 F. Supp. 1316, 1322 (S.D.N.Y. 1988); *see also Karedes*, 423 F.3d at 119. Fox's statements were markedly different from the truth and had the corresponding effect on its viewers.

### 1. Fox's statements about Jankowicz and the Board were false.

Fox's narrative was rebutted with fact sheets, public remarks, testimony under oath, and eventually the Board's charter itself. Each of these sources made clear that

the Board and Jankowicz had no operational authority, that the Board was an internal working group, and that it was not authorized to and was incapable of censoring, surveilling, or threatening anyone. App'x 55–56, ¶ 54; 56–59, ¶¶ 56–61; 68–69, ¶¶ 84–85; 70–71, ¶¶ 87–90. Accordingly, the Complaint plausibly alleged that Fox's statements about Jankowicz and the Board were false. The District Court erred by ignoring the majority of the Complaint's allegations,[15] selectively misreading the Board's charter, and ignoring the Supreme Court's repudiation of the "censorship" theory at the heart of Fox's claims.

### i. The District Court selectively misread the Board's charter.

The District Court's reasoning turned substantially on its mistaken and selective interpretation of the Board's charter. According to the District Court, because the charter said the Board would "ensure DHS efforts are coordinated, deconflicted, and harmonized," the Board must be directly involved in the MDM work of operational "Department Components." App'x 9–10 (quoting App'x 134)). Similarly, the District Court concluded that because the charter says the Board would "serv[e] as [DHS's] internal and external point of contact for coordination with state, local, tribal, and territorial partners, the private sector, and non-governmental actors regarding MDM," the "Board was formed precisely to police information and to

---

[15] The Court explicitly acknowledged it was not considering the refutations of Fox's claims described in the Complaint and above. *See* App'x 9–10.

work with non-governmental actors (such as 'media giants') to accomplish that purpose." App'x 8–9 (quoting App'x 136)). This was error.

The charter itself plausibly rebuts the District Court's reading, saying the Board's role was to "develop and support the implementation of governance policies and protocols" and to "harmonize and support coordination with" third parties. App'x 134. By its nature, such an organization is not involved in identifying, flagging, or responding to MDM. If it were, the Board would have responsibilities for what the charter called "operational responses." App'x 135. But nowhere in the charter does the Board have any responsibility for "operational responses" or operational functions of any kind. Neither the Board nor Jankowicz were responsible for identifying, assessing, or responding to MDM.

The charter also describes the Board's responsibility to "harmonize and support coordination" in greater detail to mean the Board would "serve as the central forum in the Department to ensure consistent governance and coordination of [MDM] efforts, and adherence to applicable constitutional, statutory, and regulatory authorities and obligations." App'x 135. In other words, it would act as a central forum to discuss operational components' activities, study best practices, and make recommendations. App'x 135–137.

With respect to being an "internal and external point of contact," nothing about that language implies the ability to do anything approaching the censorship,

surveillance, or other parade of horribles Fox claimed. Again, the Board had no authority over "operational responses."

Most critically, at this stage whether the District Court agreed with Jankowicz's perspective is irrelevant. Even if the District Court (and Fox's) interpretation of the charter were reasonable, which Jankowicz maintains it is not, Jankowicz's interpretation alleged in the Complaint would be no less plausible. She offered a plausible set of allegations that would allow a court to conclude, assuming the truth of those allegations and drawing all inferences in her favor, that Fox's statements would "have a different effect" on Fox's viewers than the truth. *Franklin*, 21 N.Y.S.3d at 12. Her interpretation is the one that must prevail at this stage.

The Eleventh Circuit decision *Project Veritas v. Cable News Network, Inc.* is instructive. 121 F.4th 1267 (11th Cir. 2024). In that case, the court vacated dismissal where the plaintiff asserted a defamation claim because a CNN contributor said the plaintiff had been banned from Twitter for one reason when it had been banned for another. *Id* at 1272. The district court concluded the statement was substantially true; and even if it were false, the difference between the two statements was not sufficiently meaningful to be false. The Eleventh Circuit reversed, explaining that while the district court "may be correct" that the difference was minimal, it was "nonetheless plausible that the reputational harm that arises from [the] on-air

statements [could] have a different effect on the mind of the audience from that which the pleaded truth … would have produced." *Id.* at 1282–83 (cleaned up).

The District Court wrongly took for itself the role of factfinder, determining whose reading of falsity it preferred instead of assessing whether Jankowicz's allegations of falsity were plausible. They are.

> **ii.    The Supreme Court repudiated the theory of "censorship" at the heart of Fox's narrative, enhancing the plausibility of Jankowicz's allegations.**

The District Court also pointed to the lawsuit ultimately known as *Murthy v. Missouri* as a representative example that the Board was a "hypercharged subject of political debate." App'x 14. That case, filed by Missouri, Louisiana, and five individuals, alleged that various government agencies and officials—initially including the Board and Jankowicz—pressured social media companies to censor their speech. But rather than illustrating the debate over the Board was a function of differing opinions and political views, *Murthy* demonstrates the falsity of Fox's statements about Jankowicz.

First, both the Board and Jankowicz were dismissed from the suit in the district court. *Missouri v. Biden*, 680 F. Supp. 3d 630, 705 (W.D. La. 2023), *rev'd in part sub nom. State v. Biden*, 80 F.4th 641 (5th Cir. 2023), *withdrawn and superseded sub nom. Missouri v. Biden*, 83 F.4th 350 (5th Cir. 2023), *rev'd sub nom. Murthy v. Missouri*, 603 U.S. 43 (2024). After that, the Fifth Circuit issued decisions partially

affirming and partially vacating the district court's preliminary injunction, which essentially confirmed Jankowicz's description of the Board, her role, and the charter. In affirming the injunction against the Cybersecurity and Infrastructure Security Agency ("CISA"), the only component of DHS implicated in the lawsuit, the Fifth Circuit pointed out that CISA was directly involved in activities the court viewed as likely censorship, like communicating directly with social media companies about the falsity of particular claims, flagging particular posts, and so on. *See Murthy*, 83 F.4th at 365. Accordingly, even judges most sympathetic to the plaintiffs' case in *Murthy* confirmed that only operational components like CISA were at issue. The Board is differently situated and Jankowicz plausibly alleged that neither it nor she as its Executive Director were involved in those activities.

Before the Supreme Court, the case became even more supportive of Jankowicz's allegations here. The Supreme Court reversed the Fifth Circuit, vacating the injunction altogether. *Murthy*, 603 U.S. at 76. The Court held the plaintiffs failed to show "any concrete link between their injuries and the defendants' conduct" meaning that they had failed to show any censorship or other injury traceable to any government agency or official. *Id.* at 76; *see also id.* at 58–74 (discussing and rejecting each individual plaintiff's arguments for standing).

*Murthy* confirmed that operational components of DHS and other agencies, rather than the Board, were the appropriate target of any "hypercharged" political

debate about supposed censorship. App'x 14. The entire thrust of the debate was then found to lack any cognizable injury caused by the government. That is, no government censorship of any kind occurred.

Taken together, Jankowicz's allegations and the *Murthy* decision confirm with greater emphasis that she plausibly alleged Fox's statements were false. No more is required. *See supra* Argument § I; *Project Veritas*, 121 F.4th at 1282–83.

Despite being obligated to assume the truth of all factual allegations in the Complaint, and to draw all inferences in Plaintiff's favor, the District Court jettisoned the *Iqbal* standard of review, engaging in a fact-finding mission well beyond the confines of a motion to dismiss under Rule 12(b)(6).

## 2. Fox's statements claiming Jankowicz was fired were false.

The day Jankowicz resigned, a DHS spokesperson said: "Nina Jankowicz has been subjected to unjustified and vile personal attacks and physical threats." App'x 65–66, ¶ 78. Fox included the quote in an online article. *Id*. Nevertheless for months after Fox said among other things that she was fired, "had to go," and so on. Jankowicz plausibly alleged that these statements were false because DHS wanted her to stay, explained why she was leaving, and confirmed that she had voluntarily resigned, making Fox's characterization of her departure and claimed reason for it false. That is enough. *See, e.g., DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 114

(2d Cir. 2010); *Afftrex, Ltd. v. Gen. Elec. Co.*, 555 N.Y.S.2d 903, 904 (N.Y. App. Cir. 1990) (defendant claimed plaintiff was fired for "being an evil man").

The District Court's reasoning on this issue stretched well beyond the confines of reason and the relevant standard. It concluded Fox's statements were true because being fired and resigning was a distinction without a difference, reasoning that being a policy adviser is a "lesser position." App'x 18. Among other things, this is an improper factual finding not alleged in the Complaint or argued below. The District Court erred by weighing what Jankowicz had been offered to conclude saying she was fired did not matter.

### 3. Fox's statements claiming Jankowicz was associated with Birdwatch were false.

Fox claimed that Jankowicz had ownership over Birdwatch ("her fix"), that she "pitched" it, and that she wanted to edit tweets. The full public video included statements from Jankowicz that directly contradicted these claims. The District Court again weighed allegations to conclude that because in another context Jankowicz said "I like that" about adding context to tweets, App'x 78, ¶ 108, that meant anything Fox said must be true. Even if this reading were reasonable, which it wasn't, this holding similarly rested on improper factual findings about the meaning of Jankowicz's selectively-quoted remarks in Fox's favor. Only the factfinder can weigh multiple meanings to determine what was meant and what was true or false. *Davis*, 754 F.2d at 82–83; *see also Palin*, 940 F.3d at 815.

### D. Jankowicz plausibly alleges Fox's statements were made with actual malice.

The District Court did not reach the issue of actual malice. App'x 19. Jankowicz has met this bar. "'Actual malice' means that defendants published the false information about plaintiff 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Sweeney v. Prisoners' Legal Servs. of N.Y.*, 84 N.Y.2d 786, 792 (N.Y. 1995) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)). Accordingly, the plaintiff must plausibly allege that defendants either had actual knowledge of falsity or "in fact entertained serious doubts as to the truth of the publication or . . . had a high degree of awareness of its probable falsity." *Id.* at 793 (cleaned up). "[I]t is not the district court's province to dismiss a plausible complaint" as to actual malice even if "it is not as plausible as the defendant's theory." *Palin*, 940 F.3d at 815. Allegations relevant to actual malice can and should be "considered cumulatively." *Harte-Hanks Commc'ns., Inc. v. Connaughton*, 491 U.S. 657, 690 (1989).

### 1. Fox knowingly ignored key facts.

Fox did not just miss the clarifications made by DHS, former and current government officials, other media outlets, and Jankowicz herself. It ignored those clarifications, even when they were told directly to Fox's own reporters. App'x 55, ¶ 54; 57, ¶ 59; *see Palin*, 940 F.3d at 814 (complaint gave "rise to a plausible inference that Bennet was recklessly disregarding the truth when he published the

editorial without reacquainting himself with the contrary articles"). Defendants cannot prevail on a motion to dismiss when the complaint "adequately alleges that the defendants purposely avoided the truth. . . ." *Khalil v. Fox Corp.*, 630 F. Supp. 3d 568, 585 (S.D.N.Y. 2022).

### 2. Fox has ignored factual debunking before, putting profit over accuracy.

Actual malice can also "be proved inferentially because it is a matter of the defendant's subjective mental state, revolves around facts usually within the defendant's knowledge and control, and rarely is admitted." *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987). Facts probative of actual malice include "evidence of negligence, motive and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice." *Celle*, 209 F.3d at 183 (cleaned up).

That is, while evidence of motive may not establish actual malice on its own, it remains relevant. *See id.* at 183 ("Evidence of ill will combined with other circumstantial evidence . . . may also support a finding of actual malice."). Read alongside other data points, information surfaced in defamation litigation against Fox reveals its motive, business patterns, and disregard for facts. In *Dominion*, hosts and producers who lied about Jankowicz admitted under oath that they promoted falsehoods that were implausible, refuted, or credibly denied. They admitted to lying

for ratings and profit. The Complaint details these admissions. *See* App'x 108–16, ¶¶ 161–85.

This evidence is especially salient because it does not confuse defendant's "attitude towards the plaintiff" with its attitude towards "the veracity of [its] statements concerning the plaintiff." *Tavoulareas v. Piro*, 817 F.2d 762, 795 n.45 (D.C. Cir. 1987). Rather, it shows that Fox willfully and recklessly disregards facts that interfere with audience engagement and profit maximization. Together with Jankowicz's plausible allegations about Fox's false statements in this case, the *Dominion* evidence shows "a willingness to publish falsehoods." *Id.*

### 3. Fox wanted to inflame its audience's hatred of Jankowicz and succeeded.

New York law also permits relying "in part on evidence indicating ill will and personal animosity" towards the plaintiff. *Celle*, 209 F.3d at 186. In conjunction with Fox's persistent refusal to consider reliable information about Jankowicz and the Board, its propensity to knowingly choose profits over truth, and its disregard for the content and context of Jankowicz's actual statements, Fox's clear animosity for Jankowicz and indifference to the consequences their coverage caused is relevant.

Mocking Jankowicz is not itself defamatory, but it is relevant. For Fox, Jankowicz was key to claiming DHS censorship because she provided a face and a character on which to center its narrative. Where there is "a reasonable basis for defendants to question the accuracy and reliability of the information," the Court can

and should consider "evidence of ill will" towards the plaintiff—and that evidence can bear on a finding of actual malice. *Celle*, 209 F.3d at 190.

### E. Jankowicz plausibly alleges Fox's statements were defamation *per se*.

The District Court did not address whether the Complaint had plausibly alleged defamation *per se*. Jankowicz cleared this bar too. "It has long been the law in New York that a defamatory statement that is a direct attack upon the business, trade or profession of the plaintiff is considered defamation 'per se.'" *Yesner v. Spinner*, 765 F. Supp. 48, 52 (E.D.N.Y. 1991). Falsely stating or even insinuating that a discharge "was for some misconduct" is defamatory. *Davis*, 754 F.2d at 84 (quoting *Nichols v. Item Publishers*, 309 N.Y. 596, 601 (N.Y. 1956)). Accusing Jankowicz of violating millions of Americans' First Amendment rights through supposed censorship, surveillance, and threat to their physical safety and liberty, saying she was fired, and saying that she created or supported a tool she had no role in, all speak directly to Jankowicz's career and professional integrity.

### F. Jankowicz plausibly alleges a claim against Fox Corporation.

The District Court did not reach the issue of whether Jankowicz's claims were adequately alleged against Fox Corporation in addition to Fox News Network. Jankowicz has satisfied this burden too.

Under New York law, "all who take part in the procurement, composition and publication of a libel are responsible in law and equally so." *Pisani v. Staten Island*

*Univ. Hosp.*, 440 F. Supp. 2d 168, 179 (E.D.N.Y. 2006). If the complaint plausibly alleges participation "in the creation or the publication of the statements at issue," a defendant is not entitled to dismissal. *Treppel v. Biovail Corp.*, No. 03-cv-3002, 2005 WL 2086339, at *3 (S.D.N.Y. Aug. 30, 2005) (collecting cases). Jankowicz has plausibly alleged that Rupert and Lachlan Murdoch exercise significant control over Fox News and have a direct role in publication decisions. App'x 119–20, ¶¶ 192–94.

Fox has previously tried and failed to insulate Fox Corporation from defamation claims arising from statements on Fox News. *See Khalil*, 630 F. Supp. 3d at 585; *US Dominion, Inc. v. Fox Corp.*, No. N21C–11–082 EMD CCLD 2022 WL 2229781, at *8–9 (Del. Sup. Ct. June 21, 2022). Courts rejected this argument where plaintiffs adequately alleged "executives of Fox Corporation—particularly Rupert and Lachlan Murdoch—have historically exercised a high level of control over the day-to-day operations of Fox News." *Dominion*, 2022 WL 2229781, at *8; *see also Khalil*, 630 F. Supp. 3d at 585 (same).

## CONCLUSION

For the reasons explained above, this Court should reverse the memorandum and order and remand for further proceedings.

Dated: December 30, 2024
New York, NY

Respectfully submitted,

By:  /s/ Max Rodriguez

Max Rodriguez
LAW OFFICE OF MAX RODRIGUEZ PLLC
575 5th Avenue, 14th Floor
New York, NY 10017
Tel: (646) 741-5167
max@maxrodriguez.law

Rylee Sommers-Flanigan
Molly E. Danahy
UPPER SEVEN LAW
1 N. Last Chance Gulch, Suite 5
Helena, MT 59601
(406) 306-0330
rylee@uppersevenlaw.com

*Attorneys for Plaintiff-Appellant
Nina Jankowicz*

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NINA JANKOWICZ;

    Plaintiff–Appellant,

        v.

FOX NEWS NETWORK, LLC, and FOX
CORPORATION;

    Defendants–Appellees.

Case No. 24-2544

## CERTIFICATE OF COMPLIANCE

This document complies with Federal Rule of Appellant Procedure 32(g)(1), this document contains 12,997 words of proportionally-spaced, 14-point type, and the word processing system used was Microsoft Word 365.

*/s/ Max Rodriguez*
Max E. Rodriguez
Law Office of Max Rodriguez PLLC
575 5th Avenue, 14th Floor
New York, NY 10017
Tel: (646) 741-5167
max@maxrodruguez.law
*Attorney for Plaintiff-Appellant*
*Nina Jankowicz*

Dated: December 30, 2024

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NINA JANKOWICZ;

Plaintiff–Appellant,

v.

FOX NEWS NETWORK, LLC, and FOX
CORPORATION;

Defendants–Appellees.

Case No. 24-2544

## CERTIFICATE OF SERVICE

I hereby certify that on December 30, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify further that the foregoing document was served on all parties or their counsel of record through the appellate CM/ECF system.

*/s/ Max Rodriguez*
Max E. Rodriguez
Law Office of Max Rodriguez PLLC
575 5th Avenue, 14th Floor
New York, NY 10017
Tel: (646) 741-5167
max@maxrodruguez.law
*Attorney for Plaintiff-Appellant*
*Nina Jankowicz*

Dated: December 30, 2024

No. 24-2544

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT
————————————————

NINA JANKOWICZ
Plaintiff-Appellant

v.

FOX NEWS NETWORK, LLC, and
FOX CORPORATION
Defendants-Appellees
————————————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
————————————————————

APPENDIX VOLUME 1 OF 2
Pages 1–21

## APPENDIX VOLUME 1 TABLE OF CONTENTS

ECF 41: Notice of Appeal ...................................................... 1

ECF 39: Memorandum ........................................................ 3

ECF 40: Order ................................................................... 21

**APPENDIX 1**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NINA JANKOWICZ, | |
| Plaintiff, | C.A. No. 23-cv-513-CFC |
| v. | |
| FOX NEWS NETWORK, LLC, and FOX CORPORATION, | JURY TRIAL DEMANDED |
| Defendants. | |

**PLAINTIFF'S NOTICE OF APPEAL**

Plaintiff hereby appeals to the United States Court of Appeals for the Third Circuit from the July 22, 2024 Order (D.I. 40) granting Defendants' motion to dismiss (D.I. 29), the July 22, 2024 Memorandum (D.I. 39), and all other stipulations, judgments, rulings, opinions, decisions, and orders merged therein, and all other appealable orders, rulings, and findings.

Dated: August 20, 2024

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Tel: 302-777-0300
Fax: 302-777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Rylee Sommers-Flanagan (admitted *pro hac vice*)
UPPER SEVEN LAW
P.O. Box 31
Helena, MT 59624
(406) 306-0330
rylee@uppersevenlaw.com

Max Rodriguez (admitted *pro hac vice*)

# APPENDIX

**2**

Law Office of Max Rodriguez PLLC
575 5th Avenue, 14th Floor
New York, NY 10017
Telephone: (646) 741-6430
max@maxrodriguez.law

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NINA JANKOWICZ,

Plaintiff,

v.

FOX NEWS NETWORK, LLC,
and FOX CORPORATION,

Defendants.

Civil Action No. 23-513-CFC

---

## **MEMORANDUM**

The sole count of the 93-page First Amended Complaint (the Complaint)

filed by Plaintiff Nina Jankowicz accuses Defendants Fox News Network, LLC,

and Fox Corporation (collectively, Fox) of defamation under New York law.

D.I. 26 ¶¶ 197–208; D.I. 18 at 1. According to the Complaint, Jankowicz is "an

internationally recognized expert in disinformation" who served as the Executive

Director of the now-defunct Disinformation Governance Board (the Board) housed

within the Department of Homeland Security (DHS). D.I. 26 ¶ 21. "DHS

announced the formation of the Board and the appointment of Jankowicz as [its]

Executive Director" on April 27, 2022. D.I. 26 ¶ 34. Jankowicz resigned from her

position on May 18, 2022. D.I. 26 ¶ 22. That same day, "DHS officials

announced that the Board was being 'paused.'" D.I. 26 ¶ 76. The Board "was

# APPENDIX

**4**

ultimately dissolved" in August 2022.  D.I. 26 ¶ 74; *Following HSAC,*

*Recommendation, DHS terminates Disinformation Governance Board*, U.S.

DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/news/2022/08/24/fol

lowing-hsac-recommendation-dhs-terminates-disinformation-governance-board

[https://perma.cc/GGN6-RSD7] (Aug. 24, 2022).

The Complaint alleges that Jankowicz resigned from the Board's Executive

Director position "as a result of Fox's false statements and the ensuing

harassment."  D.I. 26 ¶ 22.  In the Complaint's words:

> Fox made three categories of repeated false claims about
> Jankowicz.  First, over the course of over a year, Fox
> built a narrative calculated to lead consumers to believe
> that Jankowicz intended to censor Americans' speech.
> Anyone consuming Fox starting in April 2022
> understood that Fox was telling them that Jankowicz and
> the Board were out to censor them and that they should
> be afraid of her.
>
> Second, Fox hosts, guests, and/or commentators said that
> Jankowicz was fired from DHS.  In fact, as Fox knew,
> Jankowicz had resigned due to harassment arising from
> Fox's defamation.
>
> Third, Fox hosts, guests, and/or commentators said that
> Jankowicz wanted to give verified Twitter users the
> power to edit others' tweets.  They relied extensively on
> an obviously manipulated video—the full version of
> which was publicly available—to transform her
> description (and indeed, skepticism) of a developing beta
> feature on Twitter into a false declaration that she would
> supposedly police online speech on the platform.

D.I. 26 ¶¶ 4–6.

**APPENDIX**  5

Pending before me is Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) for Failure to State a Claim.  D.I. 29.

I.

When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff.  *Umland v. Planco Fin.*, 542 F.3d 59, 64 (3d Cir. 2008). The court may consider only the allegations in the complaint and the documents incorporated into the complaint by reference and matters of which the court may take judicial notice.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

To state a claim upon which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The complaint must include more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). It must set forth enough facts, accepted as true, to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Deciding whether a

3

# APPENDIX                                                6

claim is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

Notwithstanding the title of its motion and the fact that Fox cites *Iqbal* in the section of its brief titled "Legal Standard," *see* D.I. 30 at 10, Fox argues on pages 33–34 of its Opening Brief that in resolving its motion, I "should also apply the heightened standard of New York's Anti-SLAPP law, N.Y. C.P.L.R. § 3211(g)(1), which requires that a claim like Plaintiff's be dismissed unless the complaint establishes a 'substantial basis' for it." D.I. 30 at 33. Fox, however, never discusses how this standard requires dismissal of the Complaint other than to say that "[b]ecause the [Complaint] fails under Rule 12(b)(6), it follows *a fortiori* that [the Complaint] fails to establish a 'substantial basis' for Plaintiffs claims under section 3211(g)(1)." D.I. 30 at 34. Accordingly, Fox has waived its right to argue that even if the Complaint satisfied Rule 12(b)(6)'s requirements it should be dismissed under the heightened "substantial basis" standard. And for that reason, I need not and do not address whether § 3211(g)(1) would apply in this case. I need only determine whether the Complaint's claim for defamation under New York law satisfies the requirements of Rule 12(b)(6).

To prevail on a defamation claim under New York law, the plaintiff must establish five elements: "(1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory

APPENDIX

statement, and (5) special damages or per se actionability." *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). If the plaintiff is a public figure the plaintiff must also prove that the alleged defamatory statement "was made with actual malice, that is, made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173–74 (2d Cir. 2001) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)). It is undisputed that Jankowicz is a public figure. *See* D.I. 32 at 28.

II.

Fox argues first that Jankowicz's defamation claim should be dismissed insofar as it is based on 37 alleged statements in the Complaint that "are not even about" Jankowicz but "[i]nstead . . . address the Disinformation Board, DHS, or the Administration." D.I. 30 at 12. Fox specifically identifies the 37 challenged statements in its briefing. *See* D.I. 31-19 at 2–10. In response to this argument, Jankowicz says that "[m]any of Fox's statements about the Board were about Jankowicz," and that "Jankowicz has identified statements concerning the Board that defame her in context and by implication." D.I. 32 at 13. Jankowicz, however, identifies only one such statement: a statement alleged in paragraph 100 of the Complaint to have been made by Fox host Sean Hannity in November 2022. Accordingly, I will dismiss the Complaint insofar as Jankowicz's defamation claim

# APPENDIX

is based on the other 36 challenged statements, as it is not disputed that those

statements are not "of and concerning the plaintiff." *Palin*, 940 F.3d at 809.

With respect to the remaining statement, the Complaint alleges in paragraph

100 that Jankowicz's image was used during [a] segment" of a show when Hannity

stated that "the Board was a 'department . . . dedicated to working with the special

media giants for the purpose of policing information.'" D.I. 26 ¶ 100 (ellipses in

the original).  Jankowicz says that "[i]t is plausible that viewers understood th[is]

statement[] to be about Jankowicz." D.I. 32 at 14.  But even if that were the case,

the statement is not defamatory because it is not false.  On the contrary, according

to the Disinformation Governance Board's own charter, the "[p]urpose" of the

Board was to "guide and support the [DHS's] efforts to address mis-, dis-, and mal-

information that threatens homeland security ('MDM')," D.I. 31-1 at 10, and the

"focus" of the Board was

> on the following four cross-functional lines of effort to
> counter MDM, many of which are already underway
> ('lines of effort'): (1) identifying MDM ('Identification');
> (2) assessing and analyzing the risk that such MDM
> poses to homeland security ('Risk Assessment'); (3)
> responding to these MDM threats ('Response'); and (4)
> building resilience to MDM ('Building Resilience').

D.I. 31-1 at 10.  The charter—which Jankowicz says in her briefing is "the most

reliable information source as to the Board and Jankowicz's powers and limits,"

D.I. 32 at 6 n.2—further provided that the Board was to "serv[e] as [DHS's]

**APPENDIX**
**9**

internal and external point of contact for coordination with . . . the private sector[]
and non-governmental actors regarding MDM." D.I. 31-1 at 12. In other words,
the Board was formed precisely to police information and to work with non-
governmental actors (such as "media giants") to accomplish that purpose. *See
Police*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-
webster.com/dictionary/police [https://perma.cc/496M-SFN4] (July 15, 2024)
(defining "police" as "one attempting to regulate or censor a specified field or
activity"); *id.* (defining "police" as "to control, regulate, or keep in order by use of
police").

Jankowicz insists in her briefing that "[t]hrough media appearances, public
remarks, and testimony under oath, current and former officials made clear that the
Board had no operational authority and no role in speaking with social media
companies." D.I. 32 at 17. But whatever Jankowicz may mean or the "current and
former" officials may have meant by the phrase "operational authority," the
Board's charter expressly provided that the Board would "coordinate[],
deconflict[], and harmonize[]" the "operational responses" undertaken by DHS's
"[c]omponents." *See* D.I. 31-1 at 10 ("Whereas [DHS] Components will lead on
operational responses to MDM in their relevant mission spaces, the Board will
ensure DHS efforts are coordinated, deconflicted, and harmonized, both within
DHS and across the interagency, to ensure efficiency, unity of effort, and

7

promotion of applicable compliance and best practices."). And, as noted above,

the charter also expressly provided that the Board would "serv[e] as [DHS's]

internal and external point of contact for coordination with . . . the private sector[]

and non-governmental actors regarding MDM." D.I. 31-1 at 12.

Accordingly, since the alleged defamatory statement in paragraph 100 of the

Complaint is not false, I will also dismiss Jankowicz's defamation claim insofar as

it is based on that statement. *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 34

(N.Y. App. Div. 2014) ("Because the falsity of the statement is an element of [a]

defamation claim, the statement's truth or substantial truth is an absolute defense.")

(citation omitted).

### III.

Fox next argues that I should dismiss Jankowicz's defamation claim because

the alleged defamatory statements in the Complaint are statements of opinion that

cannot support a defamation claim as a matter of law. D.I. 30 at 14. Jankowicz

acknowledges that "[o]pinions 'are deemed privileged and, no matter how

offensive, cannot be the subject of an action for defamation.'" D.I. 32 at 14 (citing

*Mann v. Abel*, 885 N.E.2d 884, 885–86 (N.Y. 2008)). But she says that the alleged

defamatory statements in the Complaint are factual and not opinions. D.I. 32 at 13.

APPENDIX                                                    11

"Distinguishing between fact and opinion is a question of law for the court[],
to be decided based on what the average person hearing or reading the
communication would take it to mean." *Sheindlin v. Brady*, 597 F. Supp. 3d 607,
625 (S.D.N.Y. 2022) (quotation omitted).  In making that determination, the court
should consider three factors: "(1) whether the specific language in issue has a
precise meaning which is readily understood; (2) whether the statements are
capable of being proven true or false; and (3) whether either the full context of the
communication in which the statement appears or the broader social context and
surrounding circumstances are such as to signal [to] readers or listeners that what is
being read or heard is likely to be opinion, not fact." *Brian v. Richardson*, 660
N.E.2d 1126, 1129 (N.Y. 1995) (internal quotation marks and citations omitted).

## A.

The three factors individually and considered together show that the alleged
defamatory statements that fall within Jankowicz's first "category"—described by
Jankowicz as statements "calculated to lead consumers to believe that Jankowicz
intended to censor Americans' speech," D.I. 26 ¶ 4—are opinion.  First, the
language used in these challenged statements lacks readily understood precise
meaning.  "To censor" can mean various things, including "to scrutinize and revise,
to suppress or edit selectively."  BRYAN A. GARNER, GARNER'S MODERN ENGLISH
USAGE 153 (4th ed. 2016).  Censorship can also be understood as the actual

9

# APPENDIX
**12**

removal of text or video from the public realm. *See Censor*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/censor [https://perma.cc/B8FM-6LVY] (June 26, 2024) (defining "censor" in relevant part to mean "delete anything considered objectionable"). Jankowicz impliedly adopts this definition of censorship with her repeated assertions in the Complaint and her briefing that the Board lacked "operational authority." But censorship can also be understood to encompass efforts to restrain or suppress certain kinds of speech. *See id.* (defining "censor" in relevant part to mean "to examine in order to suppress"). "To suppress" means not only "to stop or prohibit the publication or revelation of" but also "to restrain" and "to inhibit." *See Suppress*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/suppress [https://perma.cc/3UCN-LZPJ] (July 13, 2024). For many if not most American citizens, the identification of their speech as "misinformation," "disinformation," or "malinformation" by a government entity authorized to "coordinat[e]" with "the private sector" "regarding" that labeling would be viewed as an effort to discourage people from engaging in that speech. *See* D.I. 31-1 at 12. Jankowicz herself seems to concede as much in her briefing. *See* D.I. 32 at 27 (Jankowicz responding "[p]erhaps" to "Fox['s] claim[] [that] 'average citizens would surely feel censored by the government labeling their posts "disinformation."'").

10

# APPENDIX

Second, the challenged statements are not readily capable of being proven

true or false because, to use Jankowicz's words, the statements were "calculated to

lead consumers to believe that Jankowicz *intended* to censor Americans' speech."

D.I. 26 ¶ 4 (emphasis added).  "[S]ubjective evaluations of intent and state of

mind . . . are matters not readily verifiable and intrinsically unsuitable as a

foundation for defamation" under New York law.  *Cummings v. City of New York*,

2020 WL 882335, at *22 (S.D.N.Y. Feb. 24, 2020).  Predictions about what

Jankowicz would do in the future, *see, e.g.,* D.I. 26 ¶ 72 (alleging that guest on Fox

show stated that Jankowicz was "going to actually be taking things off [of the

internet]") (brackets in the original), are similarly not readily verifiable statements

that are actionable under New York's libel laws.  *See Immuno AG. v. Moor-

Jankowski*, 549 N.E.2d 129, 134 (1989) ("Speculations as to the motivations and

potential future consequences of proposed conduct generally are not readily

verifiable, and are therefore intrinsically unsuited as a foundation for libel."),

*vacated on other grounds by Immuno v. Moor-Jankowski*, 497 U.S. 1021 (1990).

Jankowicz says that "referring to [her] as a 'censor' or the 'Minister of Truth,'

implies verifiable facts."  D.I. 32 at 18.  But she does not identify those facts, and

neither "censor" nor "Minister of Truth" makes apparent what those facts could be.

The third factor also favors characterizing the challenged statements as

opinion.  The challenged statements were made on shows dedicated to opinionated

commentary or a mix of commentary and the news. *See* D.I. 31-20. But more importantly, the broader context in which the challenged statements were made confirms that viewers would likely have understood the challenged statements to be opinion. It is undisputed that from the time its existence was announced by DHS, the Disinformation Governance Board was a hypercharged subject of political debate. Within two weeks of the announcement, twenty state Attorneys General called upon DHS's Secretary to disband the Board. In a public letter addressed to the Secretary, the Attorneys General stated that "[t]he Disinformation Governance Board, by its very existence, and almost certainly by design, threatens to 'enforce silence' when Americans wish to express views disfavored by the Administration." D.I. 31-5 at 5. On the same day that letter was published, two states sued the Biden Administration to prevent the implementation of what they described as a "campaign of censorship [that] culminated in . . . the creation of a 'Disinformation Governance Board." *Missouri v. Biden*, No. 22-1213 (W.D. La.), D.I. 1 ¶ 5; *see also* No. 23-513 (D. Del.), D.I. 26 ¶ 152. "In the charged context of a debate over a matter of public concern, the [viewer] will expect a certain amount of hyperbole and loose characterization—in short, a certain amount of opinion." *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1017 (1st Cir. 1988).

In sum, considering all three factors, and especially the first two, the alleged defamatory statements regarding Jankowicz's intent to censor Americans' speech

are statements of opinion and therefore not actionable as defamation under New York law. Accordingly, I will dismiss Jankowicz's defamation claim insofar as it is based on such statements.

## B.

The parties' briefing with respect to whether Jankowicz's second category of alleged defamatory statements are opinion is wanting. Neither party bothered even to identify the universe of allegations in the Complaint that a Fox employee or agent stated that Jankowicz "was fired from DHS." (Based on my own review of the Complaint, it appears that there are five alleged defamatory statements that could fall within this category, *see* D.I. 26 ¶¶ 120, 122–124.) Fox specifically addresses in its briefing three alleged statements that fall in this category—that Jankowicz "got booted" from her position as Executive Director (alleged in paragraph 122 of the Complaint), that DHS's secretary "had to yank" Jankowicz from her job (alleged in paragraph 123 of the Complaint), and that "Jankowicz was so absurd that she had to go away" (alleged in paragraph 124 of the Complaint). D.I. 30 at 20. Fox argues that these statements are "inherently imprecise" and "reflect opinions about the situation that played out as the Disinformation Board imploded." D.I. 30 at 20. Jankowicz does not dispute this contention in her briefing. Accordingly, I will dismiss her defamation claim insofar as it is based on these three alleged statements.

C.

Fox argues, and I agree, that Jankowicz's third category of alleged

defamatory statements—i.e., statements "that Jankowicz wanted to give verified

Twitter users the power to edit others' tweets," D.I. 26 ¶ 6—are assertions about

Jankowicz's motivations and intentions that are not actionable under New York

defamation law. *See Cummings*, 2020 WL 882335, at *22 ("[S]ubjective

evaluations of intent and state of mind . . . are matters not readily verifiable and

intrinsically unsuitable as a foundation for defamation" under New York law.).

Accordingly, I will dismiss Jankowicz's defamation claim insofar as it is based on

such statements.

IV.

Fox next argues that even if the alleged defamatory statements it challenges

were not protected opinions, they are still not actionable under New York

defamation law because they are substantially true. D.I. 30 at 21.

"Because falsity is an element of New York's defamation tort, and 'falsity'

refers to material not substantially true, the complaint . . . must plead facts that, if

proven, would establish that the defendant's statements were not substantially

true." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d

Cir. 2017). "[A] statement is substantially true if the statement would not have a

different effect on the mind of the reader from that which the pleaded truth would

14

have produced." *Id.* at 242 (internal quotation marks and citation omitted) (alteration in the original).

Fox contends, and I agree, that Jankowicz has not pleaded facts from which it could plausibly be inferred that the challenged statements regarding intended censorship by Jankowicz are not substantially true. On the contrary, as noted above, censorship is commonly understood to encompass efforts to scrutinize and examine speech in order to suppress certain communications. The Disinformation Governance Board was formed precisely to examine citizens' speech and, in coordination with the private sector, identify "misinformation," "disinformation," and "malinformation." D.I. 31-1 at 10. For the reasons discussed above, that objective is fairly characterized as a form of censorship.

The alleged statements to the effect that Jankowicz had been fired are similarly not sufficiently pleaded as not substantially true. According to the Complaint, on May 17, 2022, "after Jankowicz had drafted a resignation letter, DHS officials offered Jankowicz the opportunity to stay on with the agency as a policy advisor while the Board's future was under review," D.I. 26 ¶ 75. The next day, "DHS officials announced that the Board was being 'paused,'" D.I. 26 ¶ 76, and Jankowicz "chose to officially resign from the Board," D.I. 26 ¶ 77. Saying that DHS officials fired or dismissed Jankowicz from her position as the Board's Executive Director while the Board was put on pause so that DHS could determine

# APPENDIX

the Board's future would not cause a different effect in the mind of a viewer than

saying that DHS officials offered Jankowicz "the opportunity to stay on" in a lesser

position while the Board's future was under review.  Being offered the opportunity

to stay on as a mere "policy advisor" is tantamount to being demoted or dismissed

from the position of Executive Director.  Being dismissed from a position is fairly

described as being fired from that position.  *See Fire*, MERRIAM-WEBSTER ONLINE

DICTIONARY, https://www.merriam-webster.com/dictionary/fire

[https://perma.cc/E7YN-2ED3] (July 18, 2024) (defining "to fire" as "to dismiss

*from a position*") (emphasis added).  Jankowicz faults Fox because, in her words,

"Fox knew [she] had resigned when DHS would have continued to employ her."

D.I. 32.  But she alleges in the Complaint that she did not submit her resignation

until the day after DHS officials told her DHS would continue to employer *in a*

*lesser position.*  Moreover, given that Jankowicz "chose to officially resign" from

her position as Executive Director on the same day that DHS publicly announced

that the Board was being "paused," whether she resigned or was fired as the leader

of the Board would have amounted to an immaterial technicality to the ears of a

reasonable viewer because such a viewer would have expected the dismissal of the

person in charge of an enterprise that had been "paused" and whose very future

was in question.

16

# APPENDIX

Finally, the alleged defamatory statements that Jankowicz wanted to give verified Twitter users the power to edits others' tweets also are not plausibly pleaded as not substantially true. To the contrary, the Complaint itself quotes Jankowicz confirming in a Zoom session that she endorsed the notion of having "verified" individuals edit the content of others' tweets. Specifically, the Complaint alleges that Jankowicz stated "during a Zoom meeting" that she "like[d] the idea" of "verified people" "edit[ing]" Twitter and that she "like[d] the idea of adding more context to claims and tweets and other content online, rather than removing it." D.I. 26 ¶ 108.

Accordingly, regardless of whether the challenged defamatory statements are opinion, they cannot support Jankowicz's defamation claim because the Complaint does not plausibly allege that they are not substantially true.

## V.

Fox also argues that I should dismiss the Complaint because it fails to plausibly allege that the Fox speakers who made the alleged defamatory statements did so with actual malice and fails to plead any facts with respect to Fox Corporation. But since the result of my rulings above is the dismissal of

**APPENDIX** 20

Jankowicz's claim in its entirety, I need not and do not address those arguments.

7.22.24
Date

COLM F. CONNOLLY
CHIEF JUDGE

**APPENDIX**

**21**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NINA JANKOWICZ, | |
| Plaintiff, | |
| v. | Civil Action No. 23-513-CFC |
| FOX NEWS NETWORK, LLC, and FOX CORPORATION, | |
| Defendants. | |

## ORDER

At Wilmington on this Twenty-second day of July in 2024, for the reasons set forth in the Memorandum issued on this day, it is **HEREBY ORDERED** that Defendants' Motion To Dismiss Pursuant To Fed. R. Civ. P. 12(b)(6) For Failure To State A Claim (D.I. 29) is **GRANTED**.

_____
CHIEF JUDGE